**UNITED STATES of America,**
**Appellee,**

**v.**

**Domenico BANDO, a/k/a "Nick Bando,"**
**Leo Telvi and Gondolfo Miranti,**
**a/k/a "Shiekie," Appellants.**

**No. 377, Docket 24483.**

United States Court of Appeals
Second Circuit.

Argued April 1 and 2, 1957.

Decided May 13, 1957.

See, also, D.C., 20 F.R.D. 10; D.
C., 147 F.Supp. 421.

■■■■■■■■■■■■■■■■■■■■

Aaron B. Z. Silver, Brooklyn, N. Y., for appellant Bando.

Matthew H. Brandenburg, New York City, (Daniel H. Greenberg, of counsel), for appellant Miranti.

Chester E. Kleinberg, New York City, Milton H. Miller, Brooklyn (Chester E. Kleinberg, New York City, and Milton H. Miller, Brooklyn, of counsel), for appellant Leo Telvi.

Paul W. Williams, U. S. Atty., for Southern District of New York, New York City (Arthur H. Christy, Robert Kirtland, Earl J. McHugh and Adelbert C. Matthews, Jr., Asst. U. S. Attys., New York City, of counsel), for appellee.

Before CLARK, Chief Judge, LUMBARD, Circuit Judge, and LEIBELL, District Judge.

LEIBELL, District Judge.

The indictment herein charged John Dioguardi, Charles Tuso, Theodore Rij, Charles Salvatore Carlino, Domenico Bando, Leo Telvi, Joseph Peter Carlino and Gondolfo Miranti with the crime of conspiracy (T. 18 U.S.C. § 371)[1] in that

1. "§ 371. Conspiracy to commit offense or to defraud United States

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

they had conspired to injure Victor Riesel, a witness before a Federal grand jury in the Southern District of New York in a "rackets" investigation (thereby violating § 1503 of T. 18 U.S.C., the Obstructing Justice statute)[2]; and in that they had conspired to remove one of the co-conspirators Abe Telvi from the State of New York "in order to protect the said Abe Telvi from arrest upon charges of violating the laws of the State of New York, and in order to prevent his prosecution therefor and likewise the prosecution of the said defendants" (thereby violating § 1073 of Title 18 U.S.C., the Fugitive Felon Act[3]).

■ Abe Telvi's assault on Victor Riesel, by throwing acid in Riesel's face, was committed in the early morning of April 5, 1956, when Riesel was leaving a restaurant in the Borough of Manhattan. Riesel was blinded by the acid. The assault was a violation of Section 1400 of the New York Penal Law, McK. Consol. Laws, c. 40,[4] in that it "maimed" Riesel by destroying an "organ of his body," his eyes; and in that it "seriously disfigured his person" by burning his face. It was an offense under the State law, and also part of an alleged conspiracy of the defendants, except Leo Telvi, to obstruct justice.

■ "Maiming" by throwing acid in the face of the victim would also constitute the common law crime of "may-

2. "§ 1503. Influencing or injuring officer, juror or witness generally

"Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any witness, in any court of the United States or before any United States commissioner or other committing magistrate, or any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any party or witness in his person or property on account of his attending or having attended such court or examination before such officer, commissioner, or other committing magistrate, or on account of his testifying or having testified to any matter pending therein, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both. June 25, 1948, c. 645, 62 Stat. 769."

3. "§ 1073. Flight to avoid prosecution or giving testimony

"Whoever moves or travels in interstate or foreign commerce with intent either (1) to avoid prosecution, or custody or confinement after conviction, under the laws of the place from which he flees, for murder, kidnaping, burglary, robbery, mayhem, rape, assault with a dangerous weapon, or extortion accompanied by threats of violence, or attempt to commit any of the foregoing offenses as they are defined either at common law or by the laws of the place from which the fugitive flees, or (2) to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by imprisonment in a penitentiary is charged, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

"Violations of this section may be prosecuted only in the Federal judicial district in which the original crime was alleged to have been committed or in which the person was held in custody or confinement June 25, 1948, c. 645, 62 Stat. 755."

4. "§ 1400. Maiming defined; punishment

"A person who wilfully, with intent to commit felony, or to injure, disfigure or disable, inflicts upon the person of another an injury which:

"1. Seriously disfigures his person by any mutilation thereof; or,

"2. Destroys or disables any member or organ of his body; or

"3. Seriously diminishes his physical vigor by the injury of any member or organ,

"Is guilty of maiming, and is punishable by imprisonment for a term not exceeding fifteen years.

"The infliction of the injury is presumptive evidence of the intent."

hem" mentioned in Sec. 1073 of T. 18 U.S.C., as one of the types of crimes for which the person fleeing the State seeks "to avoid prosecution." The maximum punishment for maiming under the N. Y. statute (§ 1400) is fifteen years.

The trial on the Federal indictment was severed as to Dioguardi, Tuso, Rij, Charles S. Carlino and Joseph P. Carlino. The latter pleaded guilty and became a government witness. Just before presenting his proof at the trial against Bando, Leo Telvi and Miranti, on November 14, 1956, the District Attorney announced that the government would not try the offense of conspiracy to injure a witness who had appeared before the Grand Jury (§ 1503 of T. 18 U.S.C.), but only the conspiracy to violate Sec. 1073, in relation to Abe Telvi's flight across State lines in order to "avoid prosecution" in New York for the crime of maiming (mayhem), committed within the State of New York. Thus the charge boiled down to this, that the defendants conspired to get Abe Telvi out of the State of New York to help him avoid prosecution for the crime of having blinded and disfigured Riesel by throwing acid in his face on April 5, 1956, in the County of New York. The jury found all three defendants, Bando, Miranti and Leo Telvi, guilty as charged.

When Abe Telvi threw the acid at Riesel, he splashed some of it on his own face and his face was marked with red spots. Abe Telvi was a marked man; the acid marks on his face would arouse suspicion. Those who had hired him to commit the crime wanted him to go under cover and leave town. An effort to get him to go to Florida was not successful. So it was finally arranged that he would go to Youngstown, Ohio, in the company of the defendant, Joe Carlino, Abe's girl friend named de la Cruz, and his brother, Leo Telvi. Leo Telvi was in Florida when the attack on Riesel took place and after returning to New York was told of the crime and was later enlisted in the conspiracy to remove his brother Abe from the State of New York. On June 10th or 11th Leo Telvi drove his own car in which his brother Abe, the girl and Carlino traveled from New York to Youngstown, Ohio. The government contended that this was done to enable Abe Telvi to escape arrest and avoid prosecution for the maiming of Riesel. Abe Telvi and the girl remained in Youngstown about eleven days and then returned to New York by plane. It does not appear that at the time Abe Telvi was driven to Youngstown, the police knew who had committed the crime. No formal charge had been filed against anyone for the attack on Riesel. On July 28th Abe Telvi was found shot to death on Norfolk Street, on the lower East Side of New York City. The investigation of his murder eventually led to those who are alleged to have been co-conspirators in the attack on Riesel, and to those who had conspired to get Abe Telvi to leave the State of New York, to avoid prosecution for the attack.

A first indictment (C151–22) was returned September 7, 1956. Dioguardi made a motion to dismiss that indictment or for a change of venue on September 17th, because of the publicity attending the investigation of the crime and the resulting indictment. The motion was permitted to stand as against the superseding indictment (C151–65) filed September 26th, which added the defendant, Theodore Rij. On September 28th the defendants, Charles S. Carlino, Leo Telvi and Charles Tuso were permitted to join in the motion; Bando and Miranti did not join in the motion. The publicity complained of occurred in the last half of August and the first half of September. Judge Edelstein denied the motion on October 15th. The action against Dioguardi and certain other defendants was later severed.

We again stress the obligation that rests upon all law enforcement agencies to avoid making any public statements concerning the progress of the investigation of a crime or the proof already obtained as to the complicity

of any person who is either a defendant or likely to be prosecuted for the crime. Judge Edelstein's opinion (20 F.R.D. 33) properly condemned publicity emanating from law enforcement officials in criminal prosecutions in general, and in this case in particular, because of the difficulty it creates in getting a fair trial for the accused. But even that type of publicity does not make a fair trial improbable. The degree of care exercised by the trial judge in his examination of the panel of jurors on the "voir dire," to determine whether the publicity has so impressed them that they will not be able to give the defendant a fair trial, is an important consideration.

The defendants who went to trial, Miranti, Bando and Leo Telvi moved at the trial for a change of venue to the District of Columbia. They did not ask for a postponement. Their contention was that because of the publicity in the Southern District of New York the defendants could not get a fair trial here.

▇ On the first "voir dire" in selecting the jury, eleven of the prospective jurors were excused. On a second "voir dire" twenty-three additional members of the jury panel were excused. From those who remained of a panel of sixty, a jury was selected. As an indication of the care exercised in selecting the jury, the trial judge had before him eight pages of questions from defendants' attorneys to put to the prospective jurors. More than 150 pages of the stenographer's minutes deal with the selection of the jury. The trial judge conducted the examination of the prospective jurors pursuant to Rule 24, Fed.Rules Cr. Proc. 18 U.S.C. All subdivisions of that rule were complied with. Specifically the trial judge asked the jurors—"Do any of you have the slightest doubt in your minds that you will be able to serve conscientiously, fairly and impartially in this case?" The trial judge then denied defendants' motion for a change of venue with this statement: "I have not the slightest doubt as to the capacity of this jury as presently constituted to serve impartially, objectively and fairly in determining the issues of this case."

There is no good reason why we should substitute our judgment for that of the trial judge. He had an opportunity to observe the panel of jurors during the selection of the trial jury. The jurors who tried the case rendered a just verdict. The evidence to support the verdict was conclusive. Counsel on this appeal do not attack the jurors as biased or prejudiced. They make that charge against the trial judge for reasons that will be hereinafter discussed. True, the attack on Riesel had received nationwide publicity. Some of its published details were probably known to millions of readers. This would be so in the District of Columbia and in any community serviced by national press associations. Nothing could be gained by transferring the trial to the District of Columbia.

▇ The appellant, Leo Telvi, alleges as error the denial of a motion he made to have his trial severed from that of Bando and Miranti, who had been implicated in the crime of assaulting Riesel with acid. One reason why the defendant, Leo Telvi, did not wish to be tried with the other two, was that Miranti had made a confession, two in fact, which would probably be used at the trial. He had also testified before the grand jury. Judge Bryan denied the motion, 20 F.R.D. 10. Bando had also confessed. The motion for a severance was renewed before the trial judge and denied.

These confessions, if voluntary, were admissible against the persons making them. Miranti's testimony before the grand jury on September 6th mentioned Abe Telvi's brother; but his unsigned statements of August 26th and August 28th did not. Bando's confession did not mention Leo Telvi. Assuming that the contents of the statements and the grand jury testimony had been known to Leo Telvi's attorney, it would not have required the Judge who heard the motion to grant a severance at the trial as to Leo Telvi. A co-conspirator's confes-

sion, made after the termination of a conspiracy, is admissible only against himself and not against the others, because as to them it is hearsay. If the trial judge makes this clear to the jury, by a proper instruction, strictly limiting the use of the confession as against the declarant alone, that sufficiently protects the co-conspirators. Delli Paoli v. United States, 352 U.S. 232, 239, 77 S.Ct. 294, 1 L.Ed.2d 278, affirming 2 Cir., 229 F.2d 319. Judge Herlands properly instructed the jury on that point. There was no abuse of discretion in denying the motion for a severance.

Joseph Carlino's testimony as to the declarations of Abe Telvi that he threw the acid, were not admissible against Leo Telvi. Bando's and Miranti's own statements show that they knew Abe Telvi had thrown the acid and there was other proof to that effect. Carlino's testimony as to conversations he had with Leo Telvi and as to what Leo Telvi did in helping his co-conspirators move Abe Telvi from New York City to Youngstown, Ohio, were admissible as against Leo Telvi. Carlino was on the stand as a government witness and was subject to cross examination.

Proof, other than Carlino's testimony, shows conclusively that although Leo Telvi was in Florida at the time of the attack on Riesel, he learned of Abe's part in the attack soon after his own return to New York and some weeks before he joined in the second conspiracy to move Abe Telvi to Youngstown, Ohio. The court's rulings and instructions to the jury limiting the admissibility of the statements of Bando and Miranti and of Miranti's testimony before the grand jury to the defendant making the statement or giving the testimony was sufficient to protect the rights of the other defendants on trial.[5] Carlino was an accomplice of Leo Telvi's in the crime of moving Abe Telvi from the State of New York to the State of Ohio in order to avoid his prosecution for the crime of maiming, having thrown acid on Riesel. His testimony at Leo Telvi's trial as to what he told Leo Telvi about what had been done in connection with the maiming of Riesel was admissible as against Leo Telvi in proof of the con-

---

5. The following are quotations from the charge of the trial judge [From S.M. p. 2552]:

"Inasmuch as the evidence shows that Leo Telvi did not come in contact with the situation until some time after April 7th, whatever acts or statements occurred prior to the time that he may have entered the alleged conspiracy to violate Section 1073 cannot be imputed to him.

"However, and notwithstanding the foregoing instruction, it is for you to determine whether, at some time after April 7, 1956, Leo Telvi was informed by any of the other defendants or co-conspirators such as Abe Telvi or Joe Carlino of the events and conversations preceding April 7, 1956. If Leo Telvi was so informed, then the evidence of what happened prior to the time that Leo Telvi may have joined the conspiracy, if you so find, would be relevant to the issue whether or not Leo Telvi was put on notice of what had happened and what had been done. It would be relevant to such issues as to whether or not Leo Telvi had knowledge of the alleged acid attack by his brother, his brother's financial interest in the job, his brother's direct complicity in the crime, his brother's

confederates, the danger of detection and prosecution of his brother, the risk and probability of that danger of prosecution in view of Victor Riesel's prominence, in view of the resulting widespread publicity and agitation, in view of the consequent activities of such law enforcement agencies as the police and the District Attorney, and in view of the allegedly telltale acid marks on Abe's own face." [From S.M. 2562]

"In any event, the Miranti statements and testimony just referred to are binding only upon Miranti. I have explained that to you during the trial. The Leo Telvi statements just referred to are binding only upon Leo Telvi; and the Bando statement just referred to is binding only upon Bando. Even though each of such statements and testimony may mention the names of defendants other than the defendant making such statements or testimony, you are not to consider such references to the other defendants as in any way admissible against or implicating such other defendants."

"The Leo Telvi statements" were his oral statements to Agent Bracken, who testified concerning his questioning of Leo Telvi.

spiracy to move Abe Telvi across State lines. It was admissible for the reason that it was something done in furtherance of the conspiracy. It helped persuade Leo Telvi to join in that conspiracy. It established the motive for moving Abe Telvi, to have Abe Telvi go into hiding outside the State of New York, to avoid prosecution for the acid throwing crime. Carlino's statement to Leo Telvi was made about four weeks after the April 5th acid attack on Riesel. Abe Telvi was driven to Youngstown, Ohio, by Leo Telvi on June 10th.

The references in Bando's confession to Miranti and Abe Telvi could not be physically eliminated without so emasculating the document as to destroy its effect as to Bando himself. The same is true of the references to Bando and Abe Telvi in Miranti's two statements made August 26th and August 28th. Leo Telvi was not mentioned in the Bando or Miranti statements.

When Miranti appeared before the grand jury he stated that his appearance was voluntary. He was advised that if the answer to any question he was asked might involve him in a Federal crime, he could refuse to answer that question. He was advised that on the answers which he would give to questions put to him, he might be charged with a crime by the grand jury. He was also advised that his answers to questions were absolutely secret and that members of the grand jury and the Assistant United States Attorney were prohibited by law from revealing what is said or what goes on before the grand jury.

In the absence of the jury the trial judge considered the question of the admissibility of Miranti's grand jury testimony. He conducted a *voir dire* examination. The stenographers who took the testimony were examined. A doctor from the Nassau County jail was examined by attorneys for Miranti and Leo Telvi, for the purpose of showing what drugs had been given to Miranti in the period of August 29th to September 6th, and that Miranti's statement was not voluntary. One grain of phenobarbital was given Miranti on the nights of August 29th, 30th, 31st and September 5th to help him sleep and quiet his nerves. He refused to take phenobarbital on September 3rd, although prescribed. The doctor testified that the drug would have no effect on his mental condition on September 6th and that he could comprehend questions and intelligently answer them on that date. Miranti testified before the grand jury beginning 4:10 P. M. on September 6th. His testimony covers 41 typewritten pages.

■ Photostats of Miranti's grand jury testimony were given to all defendants' counsel on the morning of November 30th after the *voir dire* had been completed and the court had ruled that the testimony was admissible. It was then read into the record of the trial, in the absence of the jury. (It was later received as an exhibit and read to the jury.) During the first reading there was a short recess, in the course of which the attorney for Leo Telvi read the balance of the testimony. When the recess was over he called the attention of the trial judge to places in the remaining unread part of the Miranti testimony, in which reference was made to Abe Telvi's brother. He asked that those two short references be deleted[6]

---

6. The two parts of Miranti's grand jury testimony which Leo Telvi's attorney moved to delete, before it was read to the trial jury, are the following (in quotes):

Concerning Abe Telvi's departure in an automobile for Florida, the auto waited 15 or 20 minutes on the block where Abe lived and Abe came down "with his brother—they told me it was his brother, anyway."

"Q. That's Leo Telvi? He told me it was his brother anyway. He went upstairs and changed his clothes."

Referring to the time that Abe Telvi came around looking for Miranti, bothering him for money, a couple of weeks before Abe Telvi was shot, Miranti's grand jury testimony states: "That's the time he come around with his brother. He wanted me to meet his brother, and I don't want to meet him. * * *" Later, "He says to me 'You want to meet my brother?' I says, 'I dont want to meet nobody.' And they went away. "They got in their car and they went away."

but the trial judge denied the motion. The motion should have been granted. But the error was not so serious as to require a reversal, in view of the Court's instructions to the jury that Miranti's grand jury testimony was admissible only as against Miranti, and in view of the conclusive proof of Leo Telvi's guilt, established through the testimony of witnesses as to what he said and did in joining the other co-conspirators in their plan to move Abe Telvi from New York City to Youngstown, Ohio. The motion which Leo Telvi's attorney made for a severance and a mistrial because of the denial of the motion to delete, was properly denied.

Leo Telvi's counsel also objects to certain other evidence received at the trial. Evidence that Leo Telvi had not been gainfully employed but nevertheless sent money to his brother Abe in Youngstown, was relevant and material and tended to support Carlino's testimony that he gave Leo the money to send to Abe. Defendant's counsel argues that the testimony of Leo's lack of employment might lead the jury to believe he was a "vagrant, a person of little account." Counsel is too sensitive. The judge in his charge correctly said that Leo's employment was something the jury might want to consider "as to where he obtained money to send to his brother."

Agent Bracken testified that Leo after first agreeing to take a lie detector test, later refused. The judge sustained an objection to the latter part of the answer on the grounds that "There is a difference of opinion as to the scientific validity" of such a test. Such proof is generally considered inadmissible. Tyler v. United States, 90 U.S. App.D.C. 2, 193 F.2d 24. The trial court's statement put its finger on the disbelief, not only of scientists, but of people generally that such tests are reliable. The court in ruling on that part of Bracken's testimony and in making the above quoted statement, avoided any unfavorable inferences.

One of the named defendants, Joseph Peter Carlino, testified for the government. He told the story of how Abe Telvi was hired to attack Riesel, and of the subsequent efforts of the conspirators to get Abe Telvi out of the State.

Some of those involved in the conspiracy to attack Riesel sent Abe Telvi some money and clothes. Then they arranged for him to go by plane to Florida. When an auto, in which he was being driven to the plane, passed the Newark Air Port and did not drive in, Abe Telvi is alleged to have become suspicious of the stranger who was at the wheel of the car. Under a pretext of telephoning, Abe Telvi left the car and came back to New York.

The co-conspirators decided to make a second attempt to get Abe Telvi to go out of town. Carlino arranged with a friend named Moore to receive Abe Telvi. Leo Telvi had been informed of Abe's part in the acid attack on Riesel and had brought medicines and a sun lamp to the apartment of Abe's girl, de la Cruz, where he was in hiding in the lower East Side. Leo agreed to use his own car and drive Abe, the girl, and the defendant, Joseph P. Carlino. Leo Telvi did the driving. They went first to Ambridge, Pennsylvania, but Moore did not have any room. Moore sent them on to Youngstown, Ohio, where his wife had a rooming house. After leaving Abe and the girl at Mrs. Moore's house in Youngstown, Ohio, Leo Telvi and Carlino drove back to New York. This occurred about June 11th or 12th. Abe Telvi remained less than two weeks at Youngstown and returned to New York by plane.

After Abe Telvi was found shot dead on a street on the lower East Side on July 28th, 1956, the F.B.I. contacted his relatives including Leo Telvi, who was interviewed at the F.B.I. office. Leo Telvi was not co-operative and either lied or told only half truths. He went home and was again requested to come to the F.B.I. office. He did so. He again denied that he had ever taken a trip to

Youngstown and he denied ever sending any money orders to Mrs. Moore, using the name Leo Mulvey and a former address on Norfolk Street, N. Y. He denied knowing that his brother was involved in the Riesel case.

On the morning of August 17th Leo Telvi was arrested as a material witness. He signed no statement for the F.B.I. but Agent Bracken was a witness against him at the trial and told of his questioning of Leo Telvi, who had previously been warned of his constitutional rights not to answer, to engage counsel if he wished, and that anything he said could be used against him. Leo Telvi's false answers to Agent Bracken's questions were admissible as evidence of a consciousness of guilt. United States v. Simone, 2 Cir., 205 F.2d 480, 483.

At the trial, besides the testimony of Joseph P. Carlino as to the trip to Youngstown, there was the testimony of Abe's girl friend, de la Cruz, concerning Leo's visit to her apartment with a sun lamp and medicines and the trip to Youngstown. She also testified to meeting Leo in the hallway of her apartment, after Abe was shot, when she was in the company of a detective, and that Leo told her in Spanish not to say anything. Two other witnesses (Ezratty and Raffelo) testified to facts showing that Leo Telvi knew that Abe had thrown the acid at Riesel, and that after Abe was shot Leo told them to keep quiet and say nothing. The Moores testified that Leo drove Abe to Youngstown, and there was proof of the money orders sent to Mrs. Moore by Leo Telvi. Mrs. Moore's children testified that Leo and Abe Telvi were at their mother's house. There was also testimony of a Pennsylvania State policeman that he stopped Leo Telvi's car for speeding on June 11, 1956, on the way to New York; that Leo was driving the car, and that there was some one else in the car.

The proof of Leo Telvi's complicity in the plan to transport Abe to Youngstown, Ohio, was so complete that his trial attorney in his summation to the jury admitted that Leo had taken Abe Telvi to Youngstown and that he had sent him money. But he argued that Leo Telvi's purpose in driving Abe there was to protect Abe from bodily harm which might befall him if he remained in New York City, and that Leo's motive was not to help Abe "avoid prosecution" for the crime of throwing acid in Riesel's face, a State crime. Leo Telvi's attorney also argued that if the purpose of moving Abe Telvi to Youngstown was to avoid prosecution for a Federal crime (obstructing justice), Leo Telvi was not guilty of the conspiracy on which he was tried under the indictment. Both those contentions of Leo Telvi's attorney necessarily assumed, without saying so, that Leo knew that Abe had actually thrown the acid at Riesel. If not, why should Leo Telvi fear that bodily harm might come to Abe? And why should Leo Telvi move Abe to Ohio to avoid the Federal crime of obstructing justice, unless he knew of the acid attack on Riesel who had been a witness before the Federal grand jury in its investigating of labor racketeers? The only issue left to the jury by the summation of Leo Telvi's attorney was what was Leo's motive in moving Abe Telvi to Ohio.

One of the principal legal points urged on this appeal by all three defendants is that they were not guilty of conspiracy to commit any crime under Sec. 1073 of T. 18 U.S.C. because Abe Telvi had not yet been indicted or formally charged with any crime in June 1956, and that therefore his flight was not "to avoid prosecution." In support of their argument defendant-appellants assert that Sec. 1073 covers only two offenses: (1) the flight of an accused across State lines following the filing of a formal charge or indictment charging him with one of the crimes (such as mayhem) specified in the first half of Sec. 1073; and (2) the flight of a witness "to avoid giving testimony in any criminal proceedings in such place in which the commission of an offense punishable by imprisonment in a penitentiary is charged." Defendants' counsel argue that it would

not be an offense under Sec. 1073 for a person who committed the crime of mayhem to flee across State lines before a prosecution against him had been formally instituted, as by the filing of a charge or indictment.

An analysis of Sec. 1073 does not support any such narrow and strained construction. The words "to avoid prosecution" mean "to avoid being prosecuted." The statute does not say "to avoid *a pending* prosecution." Nor is the word "charged" used in the first half of Sec. 1073 in relation to the flight "to avoid prosecution"; but it is used, quite naturally, in the second half of Sec. 1073 in relation to a flight "to avoid giving testimony." The two are separate crimes. The latter requires some pending criminal proceeding. The former does not. It is sufficient if the fleeing felon is "subject to prosecution." United States v. Miller, D.C., 17 F.Supp. 65, 67.

Sec. 1073 was part of the anti-racketeering legislation passed by the 73d Congress (1934). It was intended to enable federal agencies to go into action against criminals who "flee from the scene of the crime beyond the jurisdiction of the State wherein the crime is committed and eventually escape punishment entirely." The construction of Sec. 1073 which appellants offer, would serve in great measure to frustrate the federal law enforcement agencies by preventing them from going into action promptly, and it would set a premium on a quick get-away across State lines by the criminal who had committed one of the crimes of violence listed in Sec. 1073.

The Court of Appeals for the Fifth Circuit passed upon this point in Barker v. United States, 178 F.2d 803, in 1949. That court held that an indictment under Sec. 1073 which alleged only that the felon's flight had taken place after the crime had been committed and not after the felon had been "charged" with the crime, was sufficient; and that flight across State lines after committing the crime constituted an offense under Sec.

1073. That section covers a set of facts which show either (1) that a charge has already been lodged against the fleeing criminal, in the State where he committed the crime, or (2) that a charge will be lodged against him when the law enforcement officers have ascertained his identity as the person who has committed the crime.[7]

Appellants object to the trial court's charge to the jury as prejudicial and grossly unfair. Counsel for Telvi states in his brief on this appeal that "It is difficult for an appellate court to appreciate the full flavor of a charge from the mere printed word absent the meaningful intonations, inflexions and emphasis of the spoken charge." He also states that counsel immediately objected to the charge upon the grounds that it constituted "a second summation for the Government" and on numerous specific grounds; that "the defendant's objections were entirely justified"; and that "violent and specific exception was taken to the charge on each of the grounds enumerated." That the objections were "violent" is clear. Counsel is also right in stating that a reading of Judge Herlands' charge fails to disclose any "meaningful intonations, inflexions and emphasis of the spoken charge." The only basis for that complaint is the statement of defendants' counsel on this appeal.

After defense counsel had taken their exceptions the judge stated to the jury:

"You will understand that the Court does not and has not expressed directly or indirectly, subtly or otherwise, by intonation or gesture, any opinion concerning any of the facts that are involved in this case."

The judge thus promptly rejected on the record any implication that he had usurped the function of the jury, the sole triers of the facts. He stressed the jury's function in a supplemental charge of six pages. He ended his supplemental charge with a clear statement of the respective functions of the judge and the jury, in the following paragraph:

---

7. Cf. United States v. Brandenburg, 3 Cir., 144 F.2d 656, 154 A.L.R. 1160.

"I have put it in a half dozen different ways because I wanted to be crystal clear, as I have tried to make it clear from the start of this case, that the jury has a job to do and the trial judge has a job to do, and it is the function of the trial judge to let the jury do what its job is without telling the jury, cleverly or otherwise, directly or indirectly, subtly or otherwise, how to do their job."

The District Attorney in his brief on this appeal, in discussing the manner in which the trial judge delivered his charge, states:

"The fact was that the manner of delivery of the Court's charge was crisp, unemotional and judicial. For counsel to seek to raise an issue of fact on that question in this Court, on the basis of no more foundation than his own objection to the charge, is improper. It is unfair to the trial judge and to the Government."

▮ In the many exceptions to the charge taken by the attorney for Telvi, he did not specifically complain about the manner in which the judge had delivered his charge to the jury. The complaint is baseless.

The judge in the course of his charge referred to the evidence on various issues in the case and on the defenses advanced by the defendants, especially by Telvi's counsel. If most of the evidence the judge referred to, "in the nature of things" supported the inference of guilt and not the theories of the defense, that was because the proof on the question of guilt was so over-whelming and the defense theories so improbable. Safford v. United States, 2 Cir., 252 F. 471, 474.

As stated above, one theory of the defense was that Leo Telvi was willing to help his brother Abe leave town, not in order to avoid any prosecution for the acid throwing, but because Leo was afraid Abe might sustain some bodily harm if he remained here. The people who wanted to get him out of town were those who had hired him to throw the acid at Riesel, as Leo Telvi knew. Would it be helping Abe Telvi to avoid bodily harm at the hands of his co-conspirators to move him to a place that they had suggested? It was left to the jurors to decide which motive prompted Leo to drive his brother, Abe Telvi, to Youngstown—was it to help him avoid prosecution for the acid throwing crime or to keep him from bodily harm at the hands of his co-conspirators.

Another defense theory was that the prosecution Abe Telvi was seeking to avoid was a prosecution for the obstruction of justice in the United States courts, a violation of Sec. 1503 of T. 18, which carries a maximum penalty of five years. The maximum penalty for the crime of maiming under the State law (N. Y. Penal Code, § 1400) is fifteen years. A lawyer might know the precise provisions of the statutes as to the penalties entailed, but even a layman would have an idea that to blind a man by throwing acid in his face would call for a heavier penalty than to keep him from testifying before a grand jury. The jurors were laymen.

▮ Some of the other criticisms of the court's charge will now be considered. The court's use of the simile of a coin, one side of which was genuine and the other side counterfeit, was not prejudicial. He could have used the words "true" and "false," and that was the thought he intended to and did convey.

▮ The court's use of the word "joke" when discussing the name Leo Mulvey, which Leo Telvi signed on the money orders he sent to Mrs. Moore for Abe Telvi, was a use of the same word Leo Telvi's counsel employed in his summation to the jury, when referring to the money orders. Was the use of the name Leo Mulvey a "joke," as Leo Telvi's counsel suggested in his summation, or was it intended to conceal the true name of the sender, Leo Telvi? Why did Leo Telvi wish to conceal his identity? The evidence had probative value in showing Leo Telvi's knowledge that he himself had done something that should be concealed.

Nor was there any error in the court's comment on Agent Bracken's testimony in the court's charge to the jury: "Is he framing Leo Telvi?" "Is he fabricating false admissions and false denials by Leo?" Agent Bracken had testified to conversations he had had with Leo Telvi. The latter's counsel tried to prove Bracken's testimony was false. In an attempt to show that, Leo Telvi's counsel had called another F.B.I. Agent to contradict Bracken. The questions posed by the court in commenting on Bracken's testimony were justified.

In Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 699, 77 L.Ed. 1321, which appellants' attorney cites in his brief, the statements and comments made by the trial judge in his charge to the jury were highly prejudicial. They bear no resemblance to the judge's charge in the case at bar. But the opinion of Chief Justice Hughes sets forth in some detail the right of the trial judge in his charge to explain to the jury and to comment upon the evidence and to draw "their attention to the parts of it which he thinks important"; that he may "express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination." In doing that he must "use great care that an expression of opinion upon the evidence 'should be so given as not to mislead, and especially that it should not be one-sided'; that 'deductions and theories not warranted by the evidence should be studiously avoided.'" In the case at bar Judge Herlands complied with every standard set forth in the opinion of the Chief Justice in the Quercia case.

Counsel also cites the case of Starr v. United States, 153 U.S. 614, 622, 14 S.Ct. 919, 38 L.Ed. 841. A reading of what the trial judge said in his charge in that case shows that the reversal of the judg-

ment was required to prevent a manifest abuse of the power of a Federal judge to comment on the evidence. The judge must exercise "due regard to the right and duty of the jury to exercise an independent judgment in the premises." See also United States v. Bloom, 2 Cir., 237 F.2d 158. Judge Herlands had due regard for the jury's function in the trial of this case and he made clear to them what that function was.

The defendants, Bando and Miranti, adopt on this appeal a number of points advanced by counsel for Leo Telvi, and strongly urge that their confessions were improperly obtained. They characterize their interrogation by the F.B.I. Agents as a "brain washing" technique. In Bando's case, it is charged that his family was taken to a hotel room and there held incommunicado while he was given an all-night interrogation. Miranti's counsel complains of ceaseless interrogation after his arraignment resulting in his breaking down and making several confessions.

It is also claimed that the trial judge erred in refusing to hold a preliminary hearing on the voluntariness of Bando's confession at the time he was requested to do so. The request was made in the midst of the testimony of Carlino. The trial judge properly refused to interrupt Carlino's testimony, but did offer to grant a preliminary inquiry as to the circumstances surrounding the Bando statement and did conduct a preliminary hearing before the two Miranti statements were received in evidence.

According to Bando's brief the judge offered to hold a preliminary hearing at the time the Bando confession was to be introduced, but his counsel, with Bando's concurrence, stated that that would not be satisfactory and that they "stood mute throughout the remainder of the trial." [8] Just what they expected

8. The declared policy to remain "mute" did not prevent Bando from interrupting on four occasions the testimony of Kerrigan, the F.B.I. Agent who took the Bando statement. The circumstances surrounding the taking of the Bando statement were testified to by Agent Kerrigan in the presence of the jury. The Bando statement was shown to Bando's counsel. He read it. When it was offered in evidence, he made no objection, following his policy to remain "mute."

to gain by that course of conduct is not apparent. They were not thereby creating a legal point for an appellate court. The trial judge in a proper exercise of discretion refused to interrupt the testimony of the witness Carlino, to inquire into the voluntariness of Bando's confession. They were in no way so closely related as to require any such course.

A defendant who absents himself in the course of the trial of a case not capital, and fails to return to court, cannot thereby bar the court from completing the trial in his absence. United States v. Loughery, Fed.Cas.No. 15,631, 13 Blatchf. 267; United States v. Parker, D.C., 91 F.Supp. 996; affirmed, 4 Cir., 184 F.2d 488, 489. "Voluntarily absenting himself from court after the trial has commenced" is a waiver of "his right to be present." Diaz v. United States, 223 U.S. 442, 455, 32 S.Ct. 250, 254, 56 L.Ed. 500. If that is the rule where a defendant voluntarily absents himself during trial, it would apply equally to a situation, where, although the defendant was present, he and his counsel remain "mute." Bando's counsel did not object when Bando's statement of August 29, 1956, made to the three F.B.I. Agents (O'Connell, McShane and Kerrigan) was offered and received in evidence. By remaining mute he waived any objection to the receipt of Bando's statement in evidence. He cannot attack it now. Benson v. United States, 146 U.S. 325, 13 S.Ct. 60, 36 L.Ed. 991.

However, we have examined into the surrounding circumstances, to see if any of Bando's constitutional rights were invaded, when he made and signed the statement of five pages in the presence of three F.B.I. Agents.

Bando was taken into custody about 9:00 P.M. on August 28th. He was questioned by the Agents, beginning about 9:45 P.M. Three times during the night he was given coffee, and once some candy bars. About 3:00 A.M. he expressed a fear that if he said anything his life would "not be worth three cents." He asked if his wife and children were being taken care of. He was assured that they were. At 6:20 A.M. August 29th Bando made a statement to Agent Kerrigan who wrote it out. It covered five pages. The last paragraph of the statement, immediately above Bando's signature, stated that he had read the statement. In his own handwriting he wrote "It is the truth and the whole truth in this matter as I know it to be." The first paragraph of the statement stated that he made the statement voluntarily and that "no threats, promises, gifts or force" had been directed towards him; that he had been advised that he did not have to make a statement and that it might be used against him in a court of law; and finally that "he could have a lawyer if he so desired." Bando signed his name and the date (8/29/56) at the bottom of every page of the statement which had been clearly written, in a printed style of handwriting, by one of the F.B.I. Agents (Kerrigan). Bando also initialed in two places slight changes in the statement. His signature was witnessed by the three F.B.I. Agents.

Bando was 47 years old. He had been employed on the night shift at a bakery. Being up all night was not a new experience. He was not detained "under aggravating circumstances." Bando was arraigned about 11:00 A.M. on August 29th. There was no undue delay in his arraignment. The trial judge rightly concluded that the confession had been freely given and that none of Bando's constitutional rights had been violated.

Bando's statement was a short and direct narrative of the conversations he had with Joseph Carlino and Miranti, of what Bando saw and did, and what Miranti, and Joseph Carlino told him they had done to carry out the plan of attacking Riesel. He also told about the pay-off after the attack; that on the afternoon of the attack Miranti gave Bando $500; that Bando soon thereafter gave the $500 to Carlino at Carlino's apartment, where Abe Telvi was sleeping at the time; and that a month after the attack Miranti gave Bando $100

for Carlino, and that he, Bando, gave it to Carlino. Bando's confession did not mention any efforts to get Abe Telvi to leave town after the assault on Riesel, and did not mention Leo Telvi.

Miranti was arrested on Friday, August 17th, 1956 at 7:00 A.M. He was arraigned the same day about 2:00 P.M. On the day of his arrest and before arraignment he was interviewed by Agent Anderson and another Agent between 8:00 A.M. and 10:30 A.M. He stated he was at Lindy's restaurant about 3:00 A.M. on April 5th but said it was to keep a date with a young woman who failed to appear. The interviews with Miranti at the Nassau County jail on August 20th, 21st and 22nd lasted about two hours each. Miranti was not helpful. On August 22nd Miranti told the Agents he would like to see his wife. On August 23rd the Agents took Mrs. Miranti to the jail and she visited with her husband for half an hour. Later that day the Agents talked to Miranti for about 2½ hours. That was the interview in which Miranti said that he was afraid of some persons and that he could not decide what was the right thing to do.

On August 24th Anderson visited Miranti for 1½ hours but Miranti again spoke only of his date at Lindy's. Two other Agents, Ragan and Cacavas, visited Miranti on August 25th for 1½ hours. Finally on August 26th when Anderson reminded him of what it meant to Riesel to lose his eyesight, Miranti broke down and began to cry. He was repentant. He said he had a story to tell and asked for some coffee. After that Miranti gave an account of what had happened in the acid attack on Riesel. Anderson wrote down Miranti's statement. When the statement was completed it was read back to Miranti and he said it was true and correct, but that he would not sign it because he had been told long ago not to sign anything. The interview with Miranti on August 26th began at 5:00 P.M. The nine page longhand statement was completed after midnight.

On August 27th Miranti refused to see Anderson on the grounds that he was tired. On August 28th Miranti made a further statement to Anderson which Anderson wrote out. That interview lasted two and one-half hours.

The records of the Nassau County jail where the interviews of August 20th and subsequent dates took place show that Miranti was not under the influence of any pills or drugs at any time during the period of the interviews. A day later Miranti was given one grain of phenobarbital to aid him to sleep. The physician who examined Miranti on August 30th testified at the trial to his good condition. Miranti's two statements to the F.B.I. were properly obtained. The charge that they were the result of "brain washing" was completely refuted.

The only mention about Abe Telvi going out of town in Miranti's statement of August 26th was that Nick (Bando) said "it had cost Joe Pilo (Carlino) $90 to take Abe somewhere in Ohio. He didn't say where." The statement did not mention Abe's brother, or Leo Telvi's name. In Miranti's statement of August 28, 1956, he described in some detail the arrangements to have Abe Telvi go to Florida. He did not mention Abe's brother or Leo Telvi's name.

While before the grand jury on September 6, 1956, Miranti testified to a conversation he had had with Charlie Woppie (Charles Carlino) in which the latter suggested getting Abe Telvi out of town and that Abe should be asked if he wanted to go to Florida; that Miranti spoke to Joe Peelo (Carlino), and that later Nick (Bando) told Miranti that Abe Telvi wanted to go; that later Charlie (Carlino) gave Miranti $600 and Miranti gave Abe Telvi $500 at Abe's apartment while Joe Carlino was in the apartment. A couple of days later Miranti was introduced by Charlie (Carlino) to a man named Joe or Frank who was to take Abe Telvi to Florida. Miranti told Joe (Carlino) and Bando later reported that Abe

Telvi would be ready the next day. Miranti described what happened when the next day he met Joe or Frank, the fellow who was going to take Abe to Florida.

Miranti also told the grand jury of later efforts made by Bando to get Miranti to give $90 to Joe Peelo (Carlino), and what it cost Joe for the trip with Abe to Ohio; and how Miranti borrowed some money from a friend and left $75 with Joe Peelo's wife. Miranti also testified that Abe and another fellow (Leo Telvi) came around looking for Miranti. That incident has already been discussed in this opinion. Miranti talked to Bando to tell Joe (Carlino) to have Abe Telvi keep away "that I can't get money no place." For two weeks nobody bothered Miranti. Then on a Saturday Bando told Miranti, "Abe got killed."

The trial judge conducted preliminary hearings in the absence of the jury, on the admissibility of Miranti's statements to Anderson, and Miranti's testimony before the grand jury. He found that Miranti's constitutional rights had not been invaded. The McNabb case, McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and the Upshaw case, Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 93 L. Ed. 100, have no application. No coercive methods or threats or inducements to confess were employed. United States v. Carignan, 342 U.S. 36, 39, 72 S.Ct. 97, 96 L.Ed. 48. The statements and grand jury testimony of Miranti were admissible as against Miranti. The trial judge also instructed the jury that if they believed that any of the statements or testimony were obtained from Bando or Miranti by coercive methods or inducements they should entirely disregard the statement or testimony. He used the language of the Carignan case in so charging.

Another point urged on this appeal is that the opening and summation of the District Attorney were improper. It is charged that in his opening to the jury the District Attorney made reference to the first conspiracy mentioned in the indictment, the conspiracy to obstruct justice by attacking Riesel who had been a witness before a Federal grand jury in an investigation into labor racketeering. The entire indictment had been read to the panel of jurors before they were questioned as to their qualifications to sit as jurors, if selected. After the opening statements to the jury had been completed, and before offering any proof, the District Attorney announced that the defendants would be tried only on the second conspiracy, to violate Sec. 1073 of Title 18 U.S.C. by moving Abe Telvi across State lines so that he could avoid prosecution for the State offense, for maiming Riesel.

Proof that Riesel had been attacked with acid was admissible to show the origin of the second conspiracy to get the attacker, Abe Telvi, to leave the State, and the nature of the crime committed, that it constituted mayhem. Proof that Riesel had been a witness before the grand jury investigating labor racketeering was also admissible, as showing a motive for the attack on Riesel, and that those in the conspiracy to have him attacked would be interested in helping the attacker avoid prosecution for the crime.

Neither Bando's attorney nor Miranti's attorney made an opening statement to the jury. Leo Telvi's lawyer did. Bando's attorney made no summation. Miranti's attorney and Telvi's attorney did.

Considering the facts of this case the District Attorney's summation was very restrained. It was not prejudicial. He was justified in his brief and correct characterization of the crime and of those who participated in it. What he said and did was in no way comparable to the conduct of the prosecutor in Berger v. United States, 295 U.S. 78, 55 S. Ct. 629, 79 L.Ed. 1314, cited by the appellants.

Complaint is also made that during lunch on one of the trial days, two jurors were heard by Mrs. Bando

(wife of a defendant) discussing the defendant's cross-examination of Carlino, the attitude of Carlino while a witness, and the government's objections to some of the questions. Mrs. Bando's brother-in-law, who was sitting nearby on a stool at the lunch counter, did not overhear the conversation. When the incident was called to the attention of the trial judge he did not question the two jurors but admonished all the jurors that at no time during the trial should they permit any incident or any line of testimony to cause them to entertain any opinion as to any issue in the case, and that they should "keep an open mind about everything connected with this case until all the evidence is in."

That was all the judicial action the incident required. If the judge had questioned the two jurors about their luncheon conversation it might have been prejudicial to the defendant Bando. This incident did not involve a communication to a juror by an outsider, as in the Remmer case, Remmer v. United States, 350 U.S. 377, 76 S.Ct. 425, 100 L.Ed. 435. Further, what Mrs. Bando claimed she overheard the jurors say was critical of Carlino and the prosecutor, and not prejudicial to the defendants.

The jury began their deliberations in this case at 2:00 P.M. on December 6, 1956. At 2:20 they asked for the statement Bando signed for the F.B.I. At 3:10 P.M. they asked to "see Carlino's testimony from the stand." They were brought into the courtroom and Carlino's testimony was read to them by the court reporter until the jurors requested him to stop reading at 4:05. The jurors then retired. At 4:30 P.M. the jurors reported their verdict. "We find the defendants Telvi, Bando and Miranti guilty as charged." Their verdict was fully warranted by the evidence.

The judgment of conviction is affirmed as to all three defendants.