**UNITED STATES of America ex rel. William R. MONKS, Relator,**

v.

**WARDEN, NEW JERSEY STATE PRISON AT RAHWAY, Respondent.**

**Civ. No. 1073–70.**

United States District Court,
D. New Jersey.

March 6, 1972.

Richard Newman, Newark, N. J., for relator; Anthony G. Amsterdam, Washington, D. C., of counsel.

Joseph D. J. Gourley, Passaic County Prosecutor by John P. Goceljak, Asst. Prosecutor, Paterson, N. J., for respondent.

## MEMORANDUM and ORDER

AUGELLI, Chief Judge:

This is an application by relator, William R. Monks, for a writ of habeas corpus. After a hearing before the Juvenile and Domestic Relations Court of Passaic County, relator was found guilty of the robbery and murder of Giovanna Giambra, as well as the assault and robbery of Naomi Weiss, and adjudged a delinquent. On March 1, 1957, relator was sentenced to an indeterminate prison term. He was then 15 years old. Relator is presently in state custody, serving a life sentence under N.J.S.A. 2A:4–37, which provides that a juvenile adjudged guilty of murder shall not be imprisoned in excess of the maximum term for an adult.

Relator challenges the legality of his confinement solely on the ground that confessions made by him, and admitted into evidence at the Juvenile hearing, were elicited by coercion contrary to federal constitutional standards.[1] On his appeal the Appellate Division of the New Jersey Superior Court considered and rejected, in an unpublished opinion, that specific argument. (A.1549–66–March 27, 1968) Two months later, on May 28, 1968, the New Jersey Supreme Court denied Monks' petition for certification (State v. Monks, 51 N.J. 578, 242 A.2d 381). Consequently, the petitioner has exhausted his available state remedies, Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953); Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1965); Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).[2] Counsel for the parties have agreed that no evidentiary hearing is necessary, and that the only issue involved is the voluntariness of relator's confessions, which this Court is asked to determine on the basis of the state court record.

The state court record disclosed the following facts: On February 16, 1957, relator was awakened from his sleep at 1:00 A.M. by the Paterson Police, who took him to the police station for questioning. After one and a half hours at the police station, the officers escorted relator to various locations to unearth purses stolen in a recent rash of purse snatchings. Some purses were recovered by the police by 3:30 A.M. Police continued to question Monks until noon of the following day, and then incarcerated him in the Passaic County Children's Shelter in Wayne.

On February 18, Juvenile Court Judge Schamach gave Detectives DeSimone

---

1. Monks has been granted parole by the State Parole Board, which becomes effective in June, 1972. This grant of parole does not deprive this Court of jurisdiction to entertain and decide relator's application. See, Jones v. Cunningham, 371 U.S. 236, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

2. The United States Supreme Court in this case on May 25, 1970, dismissed, per curiam, a writ of certiorari as "improvidently granted, without prejudice to any further appropriate proceedings below." Monks v. New Jersey, 398 U.S. 71, 90 S.Ct. 1563, 26 L.Ed.2d 54 (1970).

and Ventimiglia of the Paterson Police, upon their request, permission to question relator respecting the robbery and murder of Giovanna Giambra. This offense had occurred on November 15, 1956, in Paterson, apparently in the course of a purse snatching. Judge Schamach granted the request to interrogate relator on condition that such be done in the presence of Probation Officer Jarmolowicz, to insure that relator was "not abused in any way or taken advantage of or exhausted or placed in a position where he might say something that his physical condition probably would not allow him to say otherwise." At this juncture, the police plainly had focused their investigation on relator as a prime suspect, not only for purse snatching, but for the Giambra murder as well.

Pursuant to the Juvenile Court's approval and instructions, Detectives DeSimone and Ventimiglia questioned relator for an hour at the children shelter in the presence of Probation Officer Jarmolowicz. Relator responded that he knew of the Giambra and Weiss crimes only through newspaper reports and agreed to submit to a lie detector test. Three days later, on February 21, relator was taken to the anteroom of the Grand Jury room in the Passaic County Courthouse for a polygraph examination to be conducted by Richard Arther. Arther admonished relator that the lie detector was capable of catching him in a lie. Moreover, the examination conducted by Arther for more than an hour was, significantly, outside of the presence or supervision of Probation Officer Jarmolowicz.

Between February 21 and the 26th, a period of five days, relator had no communication with either the police or the Probation Officer. Relator's detention in the children's shelter during this period amounted to an incommunicado confinement in that he had no contact whatever with family, friend, or lawyer, and had not been informed by the police that he could communicate with anyone. His mother attempted to find him by calling the Probation Officer and the police station, but to no avail. It was not until ten days subsequent to relator's initial arrest for purse snatching, that she learned of her son's detention through newspaper accounts of his confessions.

Finally, at 9:00 A.M. on February 26, the critical day of relator's confinement, he was taken by the police from the children's shelter in Wayne to the Passaic County Courthouse for more interrogation by the detectives. There he was given polygraph tests, at varying intervals, for two hours by the examiner, Arther, who once again warned relator that the lie detector would discover the truth. Relator was then given lunch and waited in the Grand Jury room for a couple of hours where no one talked to him until the police confronted him with Harry Ogg, a neighborhood acquaintance, who stated that relator had admitted the Weiss assault to him. Relator stood silent in the face of the accusation.

Further polygraph tests followed for the next hour and a half. Relator then underwent an interrogation by the detectives during which he implicated himself in the Weiss offense for the first time by telling them that he struck Weiss from behind and took her pocketbook. Shortly thereafter, however, relator vehemently recanted his Weiss confession. A while later, at 6:30 P.M., relator was confronted with a second accuser, Robert Stopford, who stated in the presence of the detectives and Jarmolowicz that relator had told him about the Weiss assault. Again relator made no reply. With that, DeSimone questioned relator for about a half hour in a fatherly manner urging that he should tell the truth, that he "can't fool God", and that he must "search his conscience." Relator nonetheless persisted in denying his guilt of both the Weiss and Giambra offenses. Then, for the ninth time that day, February 26, relator was "put on the machine" and examined by the polygraph operator. At last, Arther declared, "You did hit her, didn't you", whereupon relator nodded his head

affirmatively and said he wanted to tell DeSimone his story. Consequently, at 8:00 P.M. relator and DeSimone were left alone and he confessed orally to the Giambra crime. After having confessed, relator was advised of his right to remain silent by Detective DeSimone who told him simply that he did not have to say anything if he did not so wish, because police wanted a "voluntary statement". His formal confessions to the Weiss-Giambra offenses were transcribed and witnessed by 1:00 A.M. Thus relator had undergone some six hours of intermittent interrogation extending over fifteen hours of police custody on February 26, before he finally relented and confessed.

The following morning, February 27, relator identified a black leather jacket, recovered by the police at his home, which he admitted he had worn on the night of the Giambra murder. Also, that day, he re-enacted the Weiss-Giambra crimes, while a policeman photographed him in various poses. However, on March 8, 1957, when relator first saw his court appointed attorney, he promptly repudiated his confessions.

██ Relator alleges that both his oral and written confessions of February 26, 1957, were the product of police coercion in violation of the guidelines contained in the Due Process Clause of the Fourteenth Amendment. Since relator's trial was commenced long prior to Escobedo v. Illinois, 378 U.S. 478, 84 S. Ct. 1758, 12 L.Ed.2d 977 (1964) and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the standards set forth in those cases are inapplicable to the case at bar. Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). Nevertheless, a confession is not admissible into evidence unless given voluntarily as a result of proper police investigatory procedures. It is axiomatic that no litmus paper test exists to determine the voluntariness of a confession but rather, the Court must evaluate the totality of circumstances in which it was obtained. United States ex rel. Russo v. State of New Jersey, 351 F.2d 429 (3 Cir. 1965), vacated on other grounds, New Jersey v. Russo, 384 U.S. 889, 86 S.Ct. 1914, 16 L.Ed.2d 995 (1966); Davis v. North Carolina, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966). Many factors converge to bear upon the issue of voluntariness, including the person's age, education, period of detention, length of interrogation, technique of conducting same, psychological pressures or other coercive means, absence of counsel, failure to advise of the right to counsel, and the right against self-incrimination. United States ex rel. Loray v. Yeager, Civil Action No. 668–67 (D.N.J.–unpublished), July 31, 1968, aff'd, United States ex rel. Loray v. Yeager, 446 F.2d 1360 (3 Cir. 1971).

██ Relator, a boy of fifteen, was the center of a homicide investigation for eight days during which he was completely isolated from any outside assistance, including his mother. Most important is relator's long detention without any fixed time or expectation of release and respite from his incommunicado confinement. The impression conveyed to the boy was unmistakable: he would be held at the pleasure of the police until he confessed to the Weiss-Giambra attacks. Cf. In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); Johnson v. New Jersey, supra. Furthermore, the technique of interrogation employed by the police was inherently coercive, especially in the juvenile setting of the instant case. Polygraph examiner Arther was as much a part of the interrogation process as were the detectives. Detectives DeSimone and Ventimiglia were guided in their questioning of relator by his reactions to the polygraph machine, which explains why he was "put on the machine" nine times during his six hours of custodial interrogation on February 26. The questioning was not continuous but "on and off", allowing for five to fifteen minute intervals in which the detectives would confer in whispered tones in the corner of the Grand Jury room beyond relator's range of hearing, but within his view. Thus,

relator was subjected to the familiar "relay" method of interrogation whereby a prisoner is constantly kept off balance, if not apprehensive, by relays of different interrogators. This method cannot be overemphasized as a contributing factor to the ultimate breakdown of relator's will to resist. The effect of the lie detector as an instrument of coercion was enhanced by Arther's warning to relator that it would uncover a falsehood. Since the unreliability of lie detectors as a means of discovering the truth is a matter of wide judicial recognition, the examiner's warning amounted to a misrepresentation of scientific fact. Though not tantamount to trickery, the misrepresentation under the circumstances was improper and a factor to be considered in connection with Due Process standards. See State v. McDavitt, 118 N.J.Super. 77, 286 A.2d 86 (App. Div.1971).

Relator was advised of his right to remain silent only after he had confessed orally to the Giambra murder, eight days subsequent to when the investigation had focused on him for the murder. Needless to say, a constitutional warning coming after the prisoner has confessed is a travesty of the Fifth Amendment right against self-incrimination. Juvenile suspects in particular should be informed of their constitutional safeguards at the outset of a custodial interrogation in language that makes their rights clearly understood by them. As the Supreme Court noted in Davis v. North Carolina, supra, even where Miranda is inapposite, the fact that a defendant was not advised of his right to remain silent is nonetheless a significant factor in weighing the voluntariness of his statements.

Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), the leading case on the voluntariness of pre-Miranda juvenile confessions, is dispositive of the case at bar. Haley, also a fifteen year old, was arrested at midnight in connection with a murder, and questioned for five hours at a police station where he confessed upon being shown confessions of his co-suspects. No friend, parent or lawyer was present at Haley's interrogation. Prior to confessing, however, he signed a warning-waiver statement informing him that his confession could be used against him. Nevertheless, Haley's confession was found involuntary. Similarly, in Gallegos v. Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), the confession of a fourteen year old boy suspected of assault and robbery was held involuntary. There, the defendant confessed orally to the police shortly after arrest, and signed a formal confession after six days of confinement in a juvenile hall. He also had been denied access to counsel and to family. See also, Jordan v. Cardwell, 334 F.Supp. 193 (N.D.Ohio 1971); Ledbetter v. Warden, Maryland Penitentiary, 368 F.2d 490 (4 Cir. 1966); Vanleeward v. Rutledge, 369 F.2d 584 (5 Cir. 1966).

Moreover, the presence of Probation Officer Jarmolowicz during the interrogation of relator cannot remove this case from the mandate of Haley and Gallegos. For Jarmolowicz plainly failed to fulfill his prophylactic purpose of insulating his charge from the pressures of a prolonged interrogation. The way in which the Probation Officer perceived his function during the investigation is disclosed by his own testimony before the Juvenile Court. Jarmolowicz testified that he gave relator "the sort of counseling I would give any boy in any juvenile court * * *", namely, "that if he really knew anything about these offenses that he should unburden himself and search his conscience * * *." Indeed, Jarmolowicz's advice to relator is indistinguishable from the paternal approach taken by Detective DeSimone who also urged relator to "search his conscience." Because the Probation Officer allied himself, however unwittingly, with the detectives in their ongoing interrogation of relator, this Court can only conclude that relator viewed Jarmolowicz merely as another interrogator rather than a guardian. United States ex rel. Smith v. Yeager, 336 F.Supp. 1287, pp. 1303–1304 (D.N.

J.) aff'd 451 F.2d 164 (3 Cir.), cert. denied 404 U.S. 859, 92 S.Ct. 112, 30 L.Ed.2d 101 (1971). In addition, the Probation Officer was not with relator: (1) during the polygraph examinations; (2) when he first confessed to the Giambra offense while alone with De-Simone in the Grand Jury anteroom; and (3) during the photographed re-enactments of the Weiss-Giambra assaults. Consequently relator was alone and outside of the potentially protective presence of the Probation Officer during the most crucial periods of his custody. Jarmolowicz, in the fulfillment of his court-appointed duties, besides making it his business to be present, should have at the very least apprised relator of his right to remain silent.

Accordingly, in light of the totality of the circumstances of the case at bar this Court finds that relator's oral and written confessions were obtained by police coercion and should not have been admitted into evidence by the Juvenile Court Judge. Though the oral and written confessions were made a few hours apart, the same surrounding circumstances bore upon both confessions. Culombe v. Connecticut, 367 U.S. 568, 621, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). Likewise, the photographs taken on February 27, 1957, of petitioner re-enacting the Weiss-Giambra offenses are inadmissible. These re-enactments were the end product of an unbroken chain of coercive events which makes them no more voluntary than the prior confessions. Darwin v. Connecticut, 391 U.S. 346, 88 S.Ct. 1488, 20 L.Ed.2d 630 (1968). This Court further finds that the dark leather jacket found at petitioner's home is inadmissible in that relator directed the police to go there for it just after he had completed his confessional statements. Since the confessions are involuntary, the jacket is a poisoned fruit of the prior coercive questioning which was not attenuated by intervening events. Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

It is, therefore, on this 6th day of March, 1972,

Ordered, that a writ of habeas corpus issue, directed to respondent; execution of said writ being hereby stayed for a period of thirty (30) days from the date hereof pending a decision by the State of New Jersey to either retry relator for the offense for which he is presently confined or to effect his immediate release from custody.