**UNITED STATES of America,
Plaintiff,**

v.

**Bruce Eugene DeBETHAM, Defendant.**

**Crim. No. 12929.**

United States District Court,
S. D. California.

Sept. 8, 1972.

Harry D. Steward, U. S. Atty., Stephen G. Nelson, Catherine A. Chandler, Asst. U. S. Attys., San Diego, Cal., for plaintiff.

Federal Defenders of San Diego, Inc., by Charles M. Sevilla, San Diego, Cal., for defendant.

## MEMORANDUM OPINION

GORDON THOMPSON, Jr., District Judge.

The defendant stands charged with the unlawful possession of a controlled substance, in violation of 21 U.S.C. § 844. The charge stems from the defendant's apprehension at the Mexican-American border on December 4, 1971, while driving a car belonging to his co-defendant Charles Bland in which 5 grams of heroin were found. Bland testified at trial that he and the defendant had agreed to go to Mexico to buy the heroin and subsequently planned in common to introduce the substance into the United States. The defendant testified on his own behalf, asserting that his meeting with Bland in Mexico was mere chance and that he had no knowledge of the presence of narcotics in the car.

In support of his contention that he lacked knowledge of the heroin in the car, the defendant proffered as evidence the results of certain polygraph, or "lie detector," examinations to which he had submitted himself. If admitted, they would presumably indicate that the defendant was not attempting to deceive the polygraph examiner when he answered carefully prepared questions relative to the material issues in the case. The government opposed the admission of such evidence, contending that since 1923, when Frye v. United States, 54 U.

S.App.D.C. 46, 293 F. 1013 (1923), was decided, all federal precedent has been to the contrary.[1]

The court in *Frye* found that the lie detection technique sought to be used by the defendant, the Marston systolic blood pressure deception test, had not achieved "general acceptance in the particular field in which it belongs." 54 U.S.App.D.C. 46, 293 F. at 1014. More specifically, the court held:

> We think the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made. 54 U.S. App.D.C. 46, 293 F. at 1014.

In the instant case, this Court held several hearings in order to afford both parties adequate opportunity to present expert testimony bearing on the reliability and acceptance of the modern polygraphic interrogation technique. The Court had in mind the fact that, although the "general acceptance" test of *Frye, supra,* is regularly cited as the controlling rationale,[2] almost no appellate court has been given the opportunity to review a trial record that contained foundational evidence that might satisfy that test.[3] The result has been almost universal rejection of unstipulated polygraph evidence,[4] occasionally without any stated reason therefor. For example, two recent Ninth Circuit cases, United States v. Sadrzadeh, 440 F.2d 389 (1971), and United States v. Salazar-Gaeta, 447 F.2d 468 (1971), each upheld the trial court's rejection of polygraph results offered by the defendant, although it is not at all clear from the decisions whether they were premised on unreliability or lack of general acceptance or some collateral policy reason.

1. *E. g.,* Tyler v. United States, 90 U.S.App. D.C. 2, 193 F.2d 24 (1951), cert. denied, 343 U.S. 908, 72 S.Ct. 639, 96 L.Ed. 1326 (1952); Marks v. United States, 260 F.2d 377 (10th Cir. 1958), cert. denied, 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302; McCroskey v. United States, 339 F.2d 895 (8th Cir. 1965); United States v. Bando, 244 F.2d 833 (2nd Cir. 1957), cert. denied, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53; United States v. Wainwright, 413 F.2d 796 (10th Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 566, 24 L.Ed.2d 501 (1969); United States v. Sadrzadeh, 440 F.2d 389 (9th Cir. 1971); United States v. Salazar-Gaeta, 447 F.2d 468 (9th Cir. 1971); United States ex rel. Szocki v. Cavell, 156 F.Supp. 79 (W.D.Pa.1957); United States v. Stromberg, 179 F.Supp. 278 (S.D.N.Y.1959); United States ex rel. Sadowy v. Fay, 189 F.Supp. 150 (S.D.N.Y.1960); Sheppard v. Maxwell, 231 F.Supp. 37 (S.D.Ohio 1964); United States ex rel. Monks v. Warden, N.J. State Prison, 339 F.Supp. 30 (D.N.J.1972).

2. Of those cases cited in note 1, *supra,* only *Sadrzadeh, Salazar-Gaeta,* and *ex rel. Szocki,* fail to cite *Frye,* or cases which ultimately rely on *Frye.* Instead, they seem to operate on what might be termed a "traditional" assumption that such evidence is inadmissible, since no reasons are advanced for the holdings therein.

3. With the possible exception of United States v. Wainwright, the reported federal decisions cited in note 1, *supra,* all appear to have been decided without the benefit of substantial foundational evidence in support of the polygraph. Even in *Wainwright,* there was apparently no "live" testimony, but merely a citation to "periodical literature . . . relating to the reliability of polygraph testing." 413 F.2d at 803. Dean Wicker, in his 1953 analysis of some 14 state cases on the subject, comments: "With reference to the prevailing general rule that polygraph tests are inadmissible, nearly all of the cases parrot the language of the *Frye* case of 1923." He goes on to say that in the absence of up-to-date information on the opinions of qualified scientists, it is "not surprising that our courts have continued to quote from a case decided when this technique was in its infancy." Wicker, The Polygraphic Truth Test and the Law of Evidence, 22 Tenn.L.Rev. 711, 723.

4. Wicker, *supra* note 3, collecting cases. See also, The Polygraphic Technique—A Selective Analysis, 20 Drake L.Rev. 330, 335–37 (1971), for a more recent discussion of the prevailing judicial attitude toward the polygraph. See generally, Kaplan, The Lie Detector: An Analysis of Its Place in the Law of Evidence, 10 Wayne L.Rev. 381 (1964); Annot. 23 A.L.R.2d 1306 (1952).

*Sadrzadeh* stated flatly, "We find the proffer of a lie detector test was properly rejected." 440 F.2d at 390. *Salazar-Gaeta* was equally cryptic, citing *Sadrzadeh* as authority.

At the same time the Tenth Circuit in United States v. Wainwright, 413 F.2d 796 (1969), recently indicated that the door might not be forever closed to polygraph evidence, were its proponents to offer "relevant expert testimony relating to the probative value of such evidence," so as to "supply the condition noted by Wigmore that before such evidence be admitted an expert testify 'that the proposed test is an accepted one in his profession and that it has a reasonable measure of precision in its indications.' 3 Wigmore on Evidence (3d Ed. 1940) § 990." 413 F.2d at 803.[5]

In view of the foregoing, this Court was of the opinion that the time was ripe to make a careful review of the premises underlying the general rejection of unstipulated polygraph evidence, and that the defendant, if able to do so, should be permitted to lay a foundation to establish the reliability and acceptance of the polygraphic technique so that either this Court or those entrusted with appellate review would be able to make a truly informed decision regarding this most controversial issue.

At the outset of this inquiry it is important to delimit the actual issue before this Court, so as to clarify what is and what is not decided here. The question presented by the facts of the instant case is whether, absent a stipulation by the parties, the Court sitting without a jury may receive in evidence the results of a polygraph examination offered by the defendant in a criminal case. Thus, we are not concerned with the admission of polygraph evidence in a jury trial, or in a civil trial, or where the parties have stipulated as to admissibility. Nor do we decide whether the results of a polygraph test should be admitted to bolster or impeach the testimony of witnesses other than the defendant. In short, the extension of this opinion beyond its factual setting is not at all encouraged.[6]

I

As noted previously, the primary articulated reason for rejecting polygraph evidence has been its alleged failure to achieve "general acceptance" in the scientific community. In Frye v. United States, *supra,* where this standard of admissibility was first applied to instrumental lie detection in 1923, the court listed by name what it felt to be the relevant fields of science from which the Marston systolic blood pressure deception test was required to secure approval: to wit, physiology and psychology. If the functioning and basic theory of the modern polygraph technique are analyzed, this still appears to be a logical starting point, since the technique draws upon both of these disciplines to a great extent.

Summarized and simplified, the polygraph is an electromechanical instrument which simultaneously measures and records certain physiological changes in the human body, which it is believed are involuntarily caused by an examinee's conscious attempts to deceive an interrogator while responding to a

5. See also, State v. Valdez, 91 Ariz. 274, 371 P.2d 894, 898 (1962), wherein Vice Chief Justice Udall concludes a lengthy discussion concerning the advancement of the polygraphic technique with the observation that the admissibility of unstipulated polygraph evidence need not depend on a showing of absolute infallibility.

6. It is especially important to distinguish this situation from the cases where the government seeks to introduce the results of a polygraph examination over the objection of the defendant. Different and significant problems arise there in connection with the right against self-incrimination and the possible waiver of Constitutional rights, assuming that polygraph results are "testimonial in nature." Cf. Schmerber v. California, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

carefully prepared set of questions.[7] Commonly, the machine records three items of information: (1) rate and depth of respiration, (2) blood pressure and pulse rate, and (3) galvanic skin response (G.S.R.). The latter is a measurement of increased sweating of the palmar surfaces of the hand. Some newer machines even incorporate a device that detects muscular contractions that might otherwise escape the notice of the examiner and thus clandestinely distort the blood pressure reading.[8]

From a review of the evidence and scientific authorities, it appears that physiologists as a group have no real quarrel with the polygraph as an instrument for measuring and recording certain physiological responses of the human body. For example, Dr. Hard, a pyschophysiologist presented by the government, testified that the three-channel polygraph is a useful tool for studying physiological changes, though he expressed doubts as to whether any conclusions about deception could be derived therefrom. Even Professor Skolnick, a legal scholar who has written in opposition to the admission of polygraph evidence on scientific grounds, admits that:

> The recordings of blood pressure, pulse, respiration, and skin resistance

produced by the polygraph may be assumed accurate, if the mechanism has sufficiently rigorous specifications and is in proper order.[9]

However, there appears to be no such general agreement among psychologists as to the validity of the psychological theory underlying the polygraphic technique. For instance, Dr. Raskin, the only psychologist who appeared to testify in support of the defendant's motion, could not state unequivocally that the polygraphic lie detection technique enjoyed the general recognition of his profession. In fact, in a recently published paper, Dr. Raskin himself concedes:

> The lie detection technique was developed pragmatically by the field users, with the theoretical underpinnings following later. Even now, there exists no generally accepted theory which adequately explains all of the phenomena.[10]

Thus, although it appears that psychologists and psychophysiologists are currently engaged in pertinent studies and experiments which may ultimately lead to the scientific verification of the underlying psychological hypothesis of the polygraph,[11] no conclusive findings

7. Perhaps the most complete explanation of the polygraph's functioning and basic theory is contained in J. Reid & F. Inbau, Truth and Deception, 1–5 (1966). See also, Swidler & Basilio, Psychology for Interrogation, Chap. 21, "The Physiology of Lie Detection," reprinted in Zimmerman (Ed.) The Polygraph in Court, 81 (1972) (Deft's. Exhibit "F"); State v. Valdez, 91 Ariz. 274, 371 P.2d 894, 895–896 (1962). For a critical analysis of polygraph theory, see Skolnick, Scientific Theory and Scientific Evidence: An Analysis of Lie Detection, 70 Yale L.J. 694, 699–703 (1961).

8. Reid & Inbau, *supra* note 7, 207–218.

9. Skolnick, *supra* note 7, at 701. See also, Burack, A Critical Analysis of the Theory, Method, and Limitations of the "Lie Detector," 46 J.Crim.L., C. & P.S. 414, 423 (1955), which indicated that psychologists and physiologists believe that polygraphs are accurate in measuring the changes of physiological functions, but

are concerned about the interpretation of the test results.

10. "An Experimental Study of Field Techniques in 'Lie Detection,'" a paper presented at the Society for Psychophysiological Research, St. Louis, Oct. 24, 1971, published in Zimmerman, *supra* note 7, at 94 et seq.

11. Defendant's Exhibit "M", entitled "A Bibliography of Scientific Studies Pertaining to the Validity of Current Lie Detection Techniques," lists some 54 studies published since 1953, when Dr. Cureton's survey of the psychological community indicated that 51% of those psychologists familiar with the polygraph would recommend its use in a court setting. (Cureton, A Consensus as to the Validity of Polygraph Procedures, 22 Tenn.L.Rev. 728, 740 (1953).) Approximately 29 of the studies listed have been published over the past five years, indicating a continuing interest in the subject by psychologists.

have been brought to the Court's attention which would warrant a holding that the *Frye* test of admissibility, as interpreted by subsequent decisions, has finally been satisfied after almost half a century.[12]

## II

However, the above conclusion need not preclude further inquiry into *Frye* itself. Admittedly, that decision has been read to establish a simple but uniquely rigorous test for the admissibility of polygraph evidence, namely, general acceptance by the physiological and psychological communities.[13] But a closer analysis of *Frye* suggests that the court there did not intend to carve out a special test of admissibility for the Marston lie detector test which would be more rigorous than that applied to any other type of scientific evidence.

Frye v. United States is a relatively short opinion, occupying less than two full pages of the Federal Reporter. In that case the Court of Appeals of the District of Columbia had before it the sole question of whether it was error to exclude the results of a lie detector test offered by the defendant in a criminal jury trial. After a discussion of the theory behind the Marston systolic blood pressure technique, the court undertook to answer the appellant's contention that the applicable rule should be the one that admits into evidence the opinions of experts or skilled witnesses "in those cases in which the matter of inquiry is such that inexperienced persons are unlikely to prove capable of forming a correct judgment upon it" without the assistance of an expert in that field of inquiry. 54 U.S.App.D.C. 46, 293 F. at 1014. The court apparently found this rule to be too broad, since it proceeded to focus on the probative value of the expert's field of study itself, rather than on the ignorance of the jury. In responding to the appellant's proposed rule of evidence, the court purported to delineate a general standard of its own for the admission of scientific evidence, as follows:

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs. 54 U.S. App.D.C. 46, 293 F. at 1014.

After stating this rule, the court at once proceeded to find that the Marston test did not "yet" command such "standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made." 54 U.S.App.D.C. 46, 293 F. at 1014.

But the court made no finding that lie detector evidence posed any special threat to the proper administration of justice so as to require a specially rigorous standard of admissibility for such evidence. There is nothing in *Frye* itself which indicates that the court was concerned with anything more than the normal obligation of the trial judge to protect the jury from exposure to evidence which might mislead them. It is suggested that the court was primarily concerned with the danger that an unsophisticated jury might give Marston's

---

12. One psychologist, in commenting on the polygraph's problems in gaining general scientific acceptance, points out that scientific bodies, as a group, rarely take an official stand on a scientific instrument in any case. Burack, *supra* note 9.

13. One legal commentator points out that subsequent decisions interpreting *Frye* have required infallible reliability as well. Kaplan, *supra* note 4 at 385. See also, McCormick, Evidence, § 174, p. 372.

novel technique undue weight as ostensibly "scientific" evidence. In this regard perhaps the court was correct, in 1923, in conditioning the admissibility of the Marston lie detector test on the endorsements of scientists whose fields of study were relevant as well as relatively established at that time. Instrumental lie detection was obviously in its nascent stages and far from being that sort of body of "systematized knowledge" that is properly labeled a "science." [14] The lone experimenter with a novel device has commonly been viewed with circumspection by the courts, and rightfully so. It is always possible that a jury, in its presumed naivete, may be taken in by a charlatan in a scientist's smock, were the trial judge not to exercise his sound discretion in screening a so-called expert beforehand to determine his qualifications to testify as such. But this is true of whatever kind of scientific evidence is under scrutiny, and the *Frye* opinion is devoid of any discussion as to why the lie detector should be treated in a specially restrictive manner.[15]

Nonetheless, nearly all subsequent decisions which have applied *Frye* have interpreted it to require more of the polygraph than of other types of scientific evidence, citing the "general acceptance" language of that opinion as the reason for rejection.[16] Professor McCormick, in commenting on this phenomenon, at § 170 of his treatise on evidence, makes the following observation:

"General scientific acceptance" is a proper condition upon the court's taking *judicial notice* of scientific facts, but not a criterion for the admissibility of scientific evidence. Any relevant conclusions which are supported by a qualified expert witness should be received unless there are other reasons for exclusion. Particularly, its probative value may be overborne by the familiar dangers of prejudicing or misleading the jury, unfair surprise and undue consumption of time. (Footnote omitted.) On this footing the novelty and want of acceptance at that time [1923] of the lie detector lessened the probative value of the test and probably heightened the danger of misleading the jury. If the courts had used this approach, instead of repeating a supposed requirement of "general acceptance" not elsewhere imposed, they might have arrived at some practical way of utilizing a technique of investigation which has proved so fertile as a means of ascertaining truth. McCormick, Evidence, pp. 363–64 (1954). (Emphasis supplied.)[17]

A review by one commentator of the treatment received by other kinds of scientific evidence, namely fingerprints, ballistics, blood grouping tests (for paternity and for identification), and chemical tests for intoxication, indicates that the standard for judicial notice is not the standard of admissibility applied in those cases. Rather, an analysis of the cases reveals that in those situations where judicial notice is not appropriate, due to substantial scientific disagreement, the courts will apply the more normal standard of admissibility, which simply weighs the probative value of the proffered evidence against the traditional policy factors, such as the possibilities

14. Webster's Seventh New Collegiate Dictionary (1969) offers as one definition of "science": "a department of systematized knowledge as an object of study."

15. It seems, then, that it is only subsequent opinions that have read into *Frye* a more special purpose. For, while the opinion uses the term "general acceptance," it also speaks of a "twilight zone" within which "the evidential force of [a scientific] principle must be recognized."

Perhaps, when read as a whole, *Frye* does not, after all, require the universality of scientific acceptance prescribed by its progeny.

16. And most decisions on the admission of polygraph evidence have cited *Frye* or cases which rely on *Frye*. See, notes 1–3, *supra*.

17. See also, Kaplan, *supra* note 4, at 390–93.

of misleading or prejudicing the jury, or of unduly consuming the court's time.[18]

In view of the foregoing, this Court is inclined to agree that the standard set for the admission of polygraph evidence is artificially high and that the judicial process would be adequately protected, in a court trial setting, by applying to such evidence the normal standard for the admission of scientific evidence in general. This finding recognizes, simply, that the field of instrumental lie detection has, in the 49 years since *Frye* was decided, made undeniable advances of its own and in particular has achieved the status of a department of systematized knowledge that is currently being enriched through further investigation and research.[19] Whether polygraphy is classified as a science, or merely as an art, it appears to have something valuable to add to the administration of justice. And the judiciary can no longer afford to ignore the polygraph simply because its theoretical basis cannot be fully explained.

■ This is not to say that the polygraph may escape all requirements of demonstrating its reliability, since that is an integral part of whatever probative value the technique may possess. Nor is this to say that in applying the normal standard of admissibility of scientific evidence the polygraph need not demonstrate the support of at least "a substantial body of scientific opinion."[20] The Court concludes only that a polygraph examiner, having satisfied a particular court that he is qualified as an expert in his field, should be permitted to present foundational evidence to that

court demonstrative of the polygraph's substantial reliability and acceptance, in an effort to establish its probative value. The procedure contemplated would permit the reception of testimony concerning the particular polygraph test sought to be admitted only after these initial hurdles have been cleared, and provides for the exercise of sound judicial discretion in the course of this inquiry.[21] The alternative is to continue the unexamined policy of exclusion of such evidence, while pretending we are "so confident of the reliability of the present system of resolving conflicts in testimony by impeachment, cross-examination and inferences from demeanor, that we can afford to reject scientific aid in the task."[22]

### III

Having settled on the appropriate test of admissibility, we turn next to determine whether the defendant has in fact established the reliability and acceptance of the polygraph to such an extent that its probative value may be said to outweigh the traditional policies of exclusion. As indicated above, the Court heard extensive testimony on this issue presented by both parties. In addition, the briefs of the parties were considered in detail, and the Court undertook some independent research of its own. A careful review of the foregoing leads the Court to make the following findings.

A. First of all, there was considerable testimony presented, essentially undisputed, that polygraph testing possesses a high degree of reliability when conducted by a competent examiner under

---

18. Kaplan, *supra* note 4, at 402–07.

19. See note 11, *supra*.

20. Professor McCormick himself concedes this requirement, but answers that it has been met in the only survey conducted among psychologists familiar with the polygraph, which indicated that 51% of such scientists would recommend its use in court. McCormick, Evidence, § 174, pp. 371–72, citing Cureton, *supra* note 11.

21. On this point, Kaplan suggests that if the courts persist in requiring the judicial notice standard of admissibility, they will not be prepared to provide proper safeguards in the event the polygraph does acquire the necessary "general acceptance." Kaplan, *supra* note 4, at 386.

22. A paraphrase of McCormick, Evidence, § 174, pp. 369–70.

proper examination conditions.[23] The statistics offered by reputable, experienced examiners who testified were generally in excess of 90 per cent accuracy for actual examinations in the field, with a known percentage of error of less than 1 per cent. The most commonly cited statistics, published in 1966, indicate an accuracy of 95 per cent, with a known percentage of error of less than 1 per cent and with no diagnosis possible in 5 per cent of the cases due to the subject's physiological or psychological impairment.[24]

These statistics are bolstered by certain recent validation experiments wherein the polygraph examiner has been required to identify the lying subjects from a controlled group of known lying and non-lying subjects, or to pick out those test results which indicate deception out of a controlled group of test results previously obtained by another examiner in actual criminal investigations where the results were verified by subsequent confessions. In the former validation test the percentage of accuracy was determined to be better than 80 per cent,[25] while the latter study yielded an average accuracy of better than 87 per cent among ten examiners of varying experience, with experienced examiners scoring in excess of 91 per cent accuracy on the average.[26]

The field statistics are admittedly subject to criticism, since definite verification by confession is seldom obtained in a large percentage of cases where the examinee who "passes" the test is eliminated from further suspicion and no follow-up investigation is conducted.[27] But even if they actually approximate the accuracy achieved in the controlled experiments, between 80 and 90 per cent, the reliability of the polygraph can fairly be termed "substantial," thus warranting a finding of probative worth. A preoccupation with statistics analysis is appropriate only if we are concerned with establishing infallibility, a requirement that does not apply to the test of general admissibility.[28]

B. Secondly, it became clear from the evidence that there are factors of potential error inherent in the polygraphic interrogation technique. These can apparently stem from the examiner, the examinee or the surrounding conditions of the test itself.

1. According to the foremost authorities on the polygraph, "the most important factor involved in the use of any [polygraph] is the ability, experience, education, and integrity of the examiner himself." [29] For, it is the examiner who must screen out the "unfit" examinee, conduct the important pre-test interview (which is essential to the proper preparation of the actual test questions),[30] and supervise the environment of the test to eliminate possible distortive influences,[31] as well as ask the questions and interpret the resulting polygrams.

23. Significantly, even Lt. Haney, a polygraph expert presented by the government, conceded the truth of this statement, though he took issue with the validity of those reliability statistics claimed by polygraph proponents.

24. Reid & Inbau, *supra* note 7, at 234.

25. Testimony of Dr. Raskin, referring to his paper, "An Experimental Study of Field Techniques in Lie Detection," *supra* note 10 (1972).

26. Horvath & Reid, "The Reliability of Polygraph Examiner Diagnosis of Truth and Deception," 62 J.Crim.L., Crim. & P.S. 276 (1971). In this particular study the examiners were required to make their determinations solely from the polygrams obtained by the other examiner.

27. Laymon, Lie Detectors—Detection by Deception, 10 So. Dakota L.Rev. 1, 19–20 (1965) ; see also, Skolnick, *supra* note 7, at 699.

28. McCormick, Evidence, § 174, p. 372, wherein the author proposes that 80% accuracy is sufficient to outweigh the traditional dangers of prejudice or misleading the jury.

29. Reid & Inbau, *supra* note 7, at 4.

30. Id., at 10–16.

31. See text at note 48, *infra*.

At the same time, there appears to be little standardization of training among practicing polygraph examiners,[32] and no little concern among those experts who testified that there are unqualified examiners presently engaged in the practice of polygraphy. These problems are being addressed by a national organization of polygraph examiners, which has formulated certain minimum standards of training for the profession,[33] and has lobbied for legislative enactment of these standards by the several States. However, the legislative response has been slow, with only some eleven States having enacted some legislation to date regulating polygraph examiners.[34] To be sure, such legislation would establish a useful guideline for the courts in determining whether a particular proposed expert was qualified to testify at trial. But the absence of such legislated standards need not preclude the use of polygraph evidence, as long as a qualified examiner can be identified without an undue consumption of court time.

In the Court's opinion, a qualified examiner can be adequately identified without consuming more court time than is presently necessary to qualify any physician or psychiatrist, and an incompetent examiner can be discovered through the ordinary diligence expected of counsel in preparation for cross-examination. Definite standards of examiner qualifications have been recommended for this purpose. For example, Reid and Inbau propose that:

Before permitting the results to be admitted as evidence in any case, however, the courts should require the following: (1) That the examiner possess a college degree. (2) That he has received at least six months of internship training under an experienced, competent examiner or examiners with a sufficient volume of case work to afford frequent supervised testing in actual case situations. (3) That the witness have at least five years' experience as a specialist in the field of polygraph examinations. (4) That the examiner's testimony be based upon polygraph records that he produces in court and which are available for cross-examination purposes.[35]

Effective cross-examinations could be based upon such standards,[36] as well as upon the particular examiner's testing technique and reputation for competence and integrity. Nor should the importance of the last mentioned subject be underestimated in this regard, since the natural desire to protect his most essential reputation, which would be on trial in every case, would necessarily render

32. There are several well-known training schools for polygraph examiners, but their curricula vary in duration from 6 weeks to 6 months. Testimony of Mr. Gugas, polygraph expert.

33. I. e., the American Polygraph Association (APA), which has set forth these standards for its members in Article III of its Constitution (Def.Exh. "G").

34. Ark.Stat.Ann. §§ 71–2201 to 71–2225 (Supp.1969); Fla.Stat.Ann. §§ 493.40–493.56 (Supp.1970); Ga.Code Ann. §§ 84–5001 to 84–5016 (1970); Ill.Ann.Stat. ch. 34, §§ 202–1 to 202–30 (Smith-Hurd 1964); Ky.Rev.Stat.Ann. §§ 329.010–329.990 (1969); Miss.Code Ann. §§ 8920–61 to 8920–86 (Supp.1968); Nev. Rev.Stat. §§ 648.020–648.211 (1969); N.M.Stat.Ann. §§ 67–31–1 to 67–31–14 (Supp.1969); N.D.Cent.Code §§ 43–31–01 to 43–31–17 (Supp.1969); Vernon's Ann.Tex.Rev.Civ.Stat. art. 2615f–3 (Supp. 1969); Va.Code Ann. §§ 54–729.01 to 54–729.018 (Supp.1970).

35. Reid & Inbau, *supra* note 7, at 257. See also, Note, 20 Drake L.Rev., *supra* note 4, at 349–52, analyzing a current bill before the Iowa legislature for the regulation of polygraph examiners, and recommending standards similar to Reid & Inbau's proposal.

36. One writer points out that, although the rigidity of the standards proposed by Reid & Inbau would initially limit the quantity of qualified examiners, the supply would eventually increase as judicial acceptance rendered such rigorous training economically desirable. Dabrowski, The Polygraph Revisited: An Argument for Admissibility, IV Suffolk Univ.L.Rev. 63, 73 (Fall 1969).

every examiner most cautious in his diagnoses.[37]

2. Another source of potential error lies in the examinee. It is generally conceded that the subject of a polygraph test may somehow be rendered "unfit" due to a physical or mental deficiency. Drug ingestion may also distort certain polygraph readings. And there even appears to exist a rare group of transcendental meditators who are able to control, to some extent, their autonomic nervous system, though their number is so miniscule that they pale into insignificance.[38]

Among the physical defects that may affect polygraph test results are an abnormal heart or blood pressure condition, while temporary physiological conditions, such as a severe cold, a coughing spell or alcoholic intoxication may also render the subject unfit.[39] Mental defectives, such as feeble-minded persons (who cannot distinguish truth and falsehood), young children, psychotics, and so-called pathological liars are also considered inappropriate subjects for polygraph examination,[40] though the last mentioned are found to be "exceedingly rare in polygraph examination situations." [41] Drugs can have a definite effect on test results, though the polygraph examiner is concerned only with the subject's prior use of sedatives, such as barbiturates or tranquilizers, which are capable of reducing his deception responses by slowing down his pulse and respiration rates or perhaps by lowering his blood pressure.[42] Stimulants such as amphetamines would only increase the examinee's deception respons-

es and would ordinarily not be taken in an attempt to evade detection.[43]

The general rule with regard to the influence of physical and mental abnormalities is "that if the abnormalities are sufficiently serious to materially affect the results of the test, they are usually recognizable as such, either in the type of recording they produce or else in the appearance or demeanor of the person being tested." [44] For example, if an abnormal heart condition exists which would distort the test results, it would show up clearly to an experienced polygraph examiner in the blood pressure-pulse tracing that is routinely obtained prior to the start of the actual test. Being so informed, the examiner can safeguard against relying on this tracing for purposes of deception diagnosis, or he may decide to forego any testing of the subject until the exact physical condition of the subject is identified by a physician.[45] Similarly, the ingestion of a sedative drug whose effect is potent enough to materially reduce a subject's responsiveness to polygraph testing will by clearly indicated by drowsiness or mental sluggishness, which will be easily detected in a thorough pre-test interview.[46]

The one thing most commonly feared by the uninformed is the possibility that a truthful person's extreme nervousness, or emotional tension, due solely to the fact of being tested, may erringly identify him as a liar. However, this is safeguarded against by the fact that the polygraph tracings produced by such nervousness or tension are usually discernible from the type of tracings that

---

37. See testimony of Mr. Reid (of Reid & Inbau) in Zimmerman, *supra* note 7, at 44–45 (Deft.Exh. "F").

38. Testimony of Dr. Hard, a psychophysiologist presented by the defendant. Also, Mr. Gugas, a polygraph expert, testified that he has encountered a very few such individuals in the Middle East who are capable of such self-hypnosis, but that they were easily detected, since such control was obvious from the resulting polygraph tracings.

39. Reid & Inbau, *supra* note 7, at 184–92.

40. Id. at 196–202.

41. Id. at 201. This reflects the experience of most of the polygraph experts who testified.

42. Reid & Inbau, *supra* note 7, at 192.

43. Id.

44. Id. at 184.

45. Id. at 185.

46. Id. at 192.

indicate deception. The former are uniformly irregular in nature and will lack any consistent response to pertinent questions. It is the latter type of response which identifies the untruthful subject.[47]

3. Finally, the test conditions themselves may be the cause of distorted readings. Improper room temperature, an attempt to suppress a cough, even unobserved gum chewing may affect the test results.[48] But again an alert polygraph examiner will easily preclude error by eliminating such conditions beforehand. What is important is that the examiner possess the training and experience to know that such dangers exist. The proposed examiner's ignorance of such perils would of course be grounds for impeachment.

■ In sum, we conclude that the truly qualified polygraph examiner can eliminate or prevent test errors arising from an unfit subject or improper examination conditions, and that such an examiner's qualifications can be adequately tested through examination and cross-examination without unduly consuming the court's time. Thus, although close scrutiny of the polygraphic interrogation technique may reveal a certain potential for error therein, the Court is satisfied that sufficient safeguards exist to preclude significant impairment of the technique's reliability.

C. It remains to determine, under the test of general admissibility, whether the defendant has established the acceptance of the polygraph by a substantial body of scientific opinion. As pointed out in note 20, *supra*, one leading commentator believes that the 1952 survey of psychologists conducted by Professor Cureton[49] does just that. Another writer comments: "Although the results of Cureton's study do not precisely state the degree to which psychologists accept the lie detector as a reliable instrument, carefully phrased questions would probably result in the approval of lie detectors by a substantial group of the psychologists." [50]

Furthermore, although the approval of any relevant group of scientists should be sought, the Court is not convinced that the search for scientific acceptance should be limited to those branches of science familiar to the courts in 1923. In the 49 years since *Frye* was decided, the field of instrumental lie detection has made undeniable advances of its own, and has arguably achieved the status of a body of systematized knowledge worthy of independent study.[51]

It is therefore appropriate to consider the opinions of the several prominent polygraph experts who testified on behalf of admissibility, right along with those of members of the physiological and psychological communities. Especially significant is the opinion of the nation's foremost polygraph authorities, Reid and Inbau, who in 1966 expressed the belief that "the time has come for judicial approval of [polygraph] test results," [52] whereas they had held a contrary belief 13 years before.[53] At the same time, the Court is mindful of the two examiners presented by the government who dissented from the overwhelming majority of their brothers. However, their primary concern appeared to lie with the lack of legislated standards of examiner qualifications, rather than with the efficacy of the technique itself when administered by a competent examiner, whereas the absence of such standards has already been rejected as a conclusive roadblock to admissibility, *supra*, subpart B.

47. Id. at 169.

48. Id. at 202–203.

49. See note 11, *supra*.

50. Kaplan, *supra* note 4, at 397.

51. See, Reid & Inbau, *supra* note 7, at 264–76, for a review of current instrumentation research on the polygraph. Cf. Note 11, *supra*.

52. Reid & Inbau, *supra* note 7, *Preface*, at p. v.

53. See Inbau & Reid, Lie Detection and Criminal Interrogation, 130 (3d Ed. 1953).

Finally, the Court was especially impressed with the evidence of widespread acceptance that the polygraph has received among federal and state law enforcement agencies, who apparently rely upon the technique in their day-to-day prosecutorial decision making.[54] Particularly significant was the testimony of Mr. Brisentine of the United States Army, Criminal Investigation Division, who indicated that in his capacity as Director of Crime Records of the CID since 1965 (cf. Deft's. Exhibit "H"), he is aware of only two cases in which the Army elected to prosecute an individual who had "passed" a polygraph test. Such widespread acceptance, though not of a strictly "scientific" nature, is considerably more important, in terms of its practical effect on society, than any academic approval by the psychological community could ever be; and the Court finds it to be an ample substitute, if necessary, for the requirement of substantial scientific acceptance.

In summary, then, it appears that the probative value of the polygraph has been initially established, in view of the substantial reliability and acceptance of the technique demonstrated by the defendant. Applying the general test of admissibility, however, it still remains to determine whether some other valid reason exists which might outweigh this probative value.[55]

### IV

Various policy issues, seldom if ever discussed by the courts due to their uncritical reliance on Frye v. United States, *supra*,[56] apparently require resolution prior to a final determination with regard to the admissibility of polygraph evidence.

A. The first of these arises from the teachings of Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). In dicta, the Supreme Court strongly implies that the privilege against self-incrimination comes into play with the use of the polygraph, since it assumes that the results of a polygraph test are "essentially testimonial" in nature. 384 U.S. at 764, 86 S.Ct. 1826.

Polygraph proponents point out that the subject can make an effective waiver of the privilege, assuming that an appropriate warning has been given, Miranda v. Arizona, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and that there is an inherent safeguard in the technique in that the examinee must fully cooperate during the test in order to produce discernible results.[57] Furthermore, in the instant case the defendant has moved for admission of the polygraph results, thus obviating the need for extended discussion as to the question of voluntary waiver.

Since the government has made no such demand, we do not reach the question of whether the government may insist on the defendant's submission to testing by its own polygraph examiner. However, this would not seem unreasonable, in light of the present procedures surrounding the admission of psychiatric evidence concerning a defendant's sanity. Cf. United States v. Albright, 388 F.2d 719, 722–725 (4th Cir. 1968); United States v. Weiser, 428 F.2d 932, 935–936 (2d Cir. 1969).

In the same vein, it is interesting but unnecessary to speculate on the potential coercion imposed on some other accused to submit to a polygraph test, due to the prejudicial inferences that might be

---

54. See also, Note, 20 Drake L.Rev., *supra* note 4, at 343; Trovillo, Scientific Proof of Credibility, 22 Tenn.L.Rev. 743 (1953).

55. McCormick, Evidence, § 170, pp. 363–64.

56. See note 3, *supra*; and Note, 20 Drake L.Rev., *supra* note 4, at 343, text at note 114.

57. Wicker, *supra* note 3, at 718. Cp. Falick, The Lie Detector and the Right to Privacy, 40 N.Y.St.B.J. 102, 109 (1968).

drawn from his apparent refusal to take such a test. Presumably this would be no worse a problem than that of protecting a defendant who has asserted his right not to take the stand and testify on his own behalf.[58] Limiting instructions should suffice.

B. Probably the largest active lobby against the use of the polygraph consists of organized labor,[59] which has succeeded in its sponsorship of legislation in at least twelve states restricting or prohibiting mandatory polygraph examinations of job applicants or employees.[60] The unions allege that such legislation is necessary to prevent the invasion of the employees' privacy.[61]

However, the right to privacy is not absolute, cf. Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967), and in any event we are concerned here only with a criminal case where the defendant has presumably waived whatever right to privacy he may possess by himself moving for the introduction of polygraph test results into evidence. Additionally, we are not faced with the question of future non-consensual invasions of privacy, since the government has made no demand for a test by its own polygraph expert.

C. Finally, some legal commentators believe,[62] and at least two courts have indicated, that a prime reason underlying the adamant refusal to accept polygraph evidence is the fear that the jury

system will be displaced thereby. United States v. Stromberg, 179 F.Supp. 278, 280 (S.D.N.Y.1959); State v. Smith, 113 Ohio App. 461, 178 N.E.2d 605 (1960). In *Stromberg*, District Judge Kaufman stated this sentiment clearly:

> The most important function served by a jury is in bringing its accumulated experience to bear upon witnesses testifying before it, in order to distinguish truth from falsity. . . . It is the basic premise of the jury system that twelve men and women can harmonize those variables and decide, with the aid of examination and cross-examination, the truthfulness of a witness. . . . I am not prepared to rule that the jury system is as yet outmoded. I still prefer the collective judgment of twelve men and women who have sat through many weeks of a trial and heard all the evidence on the guilt or innocence of a defendant. 179 F.Supp. at 280.

The apparent argument is that the traditional role of the jury as the sole judges of credibility would be rendered meaningless, since once the jurors hear the expert testimony of the polygraph expert they will arguably give conclusive weight to his opinion, despite any limiting instructions to the contrary.[63] The underlying assumption, of course, is that the traditional manner of determining credibility is the only proper method. This is contrary, however, to the belief

---

58. To meet the potential problem of the defendant's using favorable polygraph evidence in lieu of taking the stand, one writer has suggested that the government's interests can be protected by conditioning admissibility on the defendant's taking the stand. The rationale is that only by doing so does the defendant place his credibility in issue, thereby making polygraph evidence relevant to the case at hand. Kaplan, *supra* note 4, at 401.

59. See Laymon, *supra* note 27, at 26.

60. Alaska Stat. § 23.10.037 (Supp.1970); Cal.Labor Code § 432.2 (West Supp. 1969); Conn.Gen.Stat.Ann. § 31–51g (Supp.1970); Del.Code Ann. tit. 19, §

705 (Supp.1968); Hawaii Rev.Stat. §§ 378–21, 378–22 (1968); Md.Ann.Code art. 100, § 95 (Supp.1969); Mass.Gen. Laws Ann. ch. 149, § 19B (Supp.1970); N.J.Stat.Ann. § 42A:170–90.1 (Supp. 1970); Ore.Rev.Stat. §§ 659.225, 659.-990(7) (1969); Pa.Stat.Ann. tit. 18, § 4666.1 (Supp.1970); R.I.Gen.Laws Ann. §§ 28–6.1–1, 28–6.1–2 (1956); Wash. Rev.Code Ann. §§ 49.44.120–49.44.130 (Supp.1969).

61. Cf. Falick, *supra* note 56.

62. Kaplan, *supra* note 4, at 413–14; Dabrowski, *supra* note 36, at 76–77.

63. Id.

of Dean Wigmore, who in 1923 declared: "If ever there is devised a psychological test for the evaluation of witnesses, the law will run to meet it." Wigmore, Evidence, (2d ed. 1923) § 875.

In any event, it is arguable that the instant case presents no danger of displacing the jury, since the issue of admissibility here must be decided in the context of a court trial.

## V

Were this Court writing on a clean slate, the foregoing conclusions under parts II, III and IV, *supra*, might well warrant a finding of admissibility in the instant case, assuming the proposed examiner or examiners were found to be qualified, the defendant was found to be a "fit" subject and the test conditions and questions were found to be proper. However, the Court chooses not to ignore the prior decisions of the Ninth Circuit, United States v. Sadrzadeh and United States v. Salazar-Gaeta, both *supra*, which on their face hold that polygraph results are properly excludable from evidence. As previously noted, a review of these decisions does not reveal the precise standard applied by the Court of Appeals in upholding the exclusion of polygraph evidence by the lower courts. Nonetheless, this Court refuses to speculate on what might have been the reasoning of the Circuit Court in those cases, let alone to proceed in an attempt to distinguish them, as suggested by the defendant.

Therefore, the Court feels constrained to hold that the unstipulated polygraph test results proffered by the defendant must be excluded, since he has failed to demonstrate the polygraph's compliance with the "general acceptance" test as set forth in Frye v. United States, *supra*, and interpreted by subsequent case law.

It is so ordered.