**UNITED STATES of America**

v.

**Barbara A. McKINNEY.**

Cr. No. B-89-0466.

United States District Court, D. Maryland.

Feb. 24, 1992.

Breckinridge L. Willcox, U.S. Atty., Barbara S. Sale, Esq. and Joyce K. McDonald, Assts. U.S. Atty., for plaintiff.

Fred Warren Bennett, Federal Public Defender, Anthony R. Gallagher, and Donna M. D'Alessio, Assts. Federal Public Defender, for defendant.

WALTER E. BLACK, Jr., District Judge.

This is a criminal case arising out of the failure of the Maryland-chartered Community Saving & Loan Association. Defendants Tom J. Billman, Clayton C. McCuistion, Barbara A. McKinney and Crysopt Corporation ("Crysopt") have been named in a 20–count indictment which includes charges of conspiracy to commit wire and mail fraud, substantive wire and mail fraud, as well as criminal violation of the Racketeer Influenced and Corrupt Orga-

nizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* While McCuistion, McKinney and Crysopt have appeared at arraignment and pled not guilty to the indictment, Billman remains at large, despite the fact that a warrant for his arrest was issued as far back as December 21, 1988. Presently pending before the Court is Defendant McKinney's Motion to Suppress Electronic Surveillance Evidence.

McKinney's motion concerns evidence gathered as a result of three orders, issued by District Judge Albert V. Bryan, Jr. of the United States District Court for the Eastern District of Virginia, authorizing the interception of wire communications. The first and third orders, respectively dated April 27, 1989, and June 1, 1989, authorized the interception of communications over McKinney's home phone in Alexandria, Virginia. The Court will refer to these as the "original" and "renewal" orders. The middle order, dated May 19, 1989, authorized interception over a phone subscribed to by L.N. Bills in Springfield, Virginia ("the Bills order"). In obtaining these three wiretap orders, the United States invoked a previously unused statutory provision authorizing interception of wire communications in an attempt to locate a fugitive from justice. McKinney argues that the affidavits accompanying the applications submitted to Judge Bryan failed to support findings which are required under the federal wiretap statute.

## I. Requirements of the Fugitive Wiretap Statute

Government interception of telephone conversations has long been recognized as a search and seizure subject to the proscriptions of the Fourth Amendment to the United States Constitution. *Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967). However, because wiretaps pose an especially severe threat to privacy interests, *see Berger v.*

*New York,* 388 U.S. 41, 63, 87 S.Ct. 1873, 1885–86, 18 L.Ed.2d 1040 (1967), Congress has enacted a series of specific safeguards controlling the circumstances under which they may be used. These safeguards are contained in Title III of the Omnibus Crime Control and Safe Streets Act. 18 U.S.C. §§ 2510, *et seq.* McKinney now argues that these requirements, which must be satisfied prior to issuance of a court order authorizing a wiretap, were not fulfilled in this case, thus necessitating suppression of the intercepted communications.

Section 2516 of Title 18 specifically delineates the purposes for which an application to intercept wire communications may be made. It authorizes the use of wiretaps where interception "may provide or has provided evidence of" many specifically enumerated criminal offenses. 18 U.S.C. § 2516(1)(a)–(k) and (m)–(o). In addition to gathering evidence of an enumerated offense, § 2516(1)(l) authorizes interception which may provide evidence of "the location of any fugitive from justice from an offense described in this section." 18 U.S.C. § 2516(1)(l).[1] It is this subsection which formed the basis of the wiretap applications now at issue. Put simply, the government sought authorization to intercept wire communications which it believed would aid its attempts to locate and apprehend Billman, whom the government considered a fugitive from justice for the enumerated offenses of mail fraud, 18 U.S.C. § 1341, wire fraud, 18 U.S.C. § 1343, and interstate transportation of money obtained by fraud, 18 U.S.C. § 2314. *See* 18 U.S.C. § 2516(1)(c).

### a. Required findings of probable cause

Where application is made for a wiretap order seeking evidence of an enumerated offense, an issuing district court must find that:

three wiretap applications at issue in this case, which were submitted shortly after the redesignation, mistakenly referenced the provision as subsection (1)(k). The Court will refer to the provision in question as 18 U.S.C. § 2516(1)(l) in its discussion of all three wiretap applications.

---

**1.** The fugitive wiretap provision was originally enacted as 18 U.S.C. § 2516(1)(k) by § 105(a)(3) of the Electronic Communications and Privacy Act of 1986, P.L.99–508, 100 Stat. 1851 (1986). It was redesignated 18 U.S.C. § 2516(1)(l) in November, 1988. *See* P.L.100–690, 102 Stat. 4374 (1988). The Court notes that two of the

(a) there is probable cause for belief that an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter;

(b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; [and]

.    .    .    .    .

(d) there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person.

18 U.S.C. § 2518(3)(a), (b) & (d).[2] *See United States v. Webster,* 639 F.2d 174, 177 (4th Cir.1981), *cert. denied,* 456 U.S. 935, 102 S.Ct. 1991, 72 L.Ed.2d 455 (1982). Section 2518(1)(b) requires that each application contain a "full and complete statement of the facts and circumstances" justifying the applicant's belief that probable cause exists. 18 U.S.C. § 2518(1)(b).

Counsel have proffered to the Court that this is a case of first impression in that there is no reported opinion in which the United States has sought authorization under 18 U.S.C. § 2516(1)(*l*) to intercept wire communications in order to help locate a fugitive from justice from an offense enumerated elsewhere in § 2516(1). As a result, no court has addressed the proper application of the probable cause requirements contained in § 2518(3) in such a case. The precise language of § 2518(3)(a), (b) and (d) does not appear to apply because § 2516(1)(*l*) authorizes the interception of evidence concerning the whereabouts of one fleeing prosecution for an enumerated crime, rather than the interception of evi-

dence concerning the enumerated crime itself.

■    The Court expressly disagrees with McKinney's position in this regard that subsection (1)(*l*) refers to a separate crime, i.e. that of being a "fugitive from justice." In fact, there is no crime entitled "fugitive from justice." Rather, Chapter 49 of Title 18 is so entitled and contains four offenses in §§ 1071–1074, including "Flight to avoid prosecution or giving testimony." 18 U.S.C. § 1073. If § 2516(1)(*l*) were intended to add to the list of enumerated offenses, it would surely have referenced Chapter 49 or, at least, 18 U.S.C. § 1073. Moreover, the Court notes that while each of subsections 2516(1)(a)–(k) and (m)–(*o*) refers to either an offense, a violation, or a conspiracy to commit an offense, subsection § 2516(1)(*l*) stands alone in its reference to the "*location* of any fugitive from justice from an offense described in this section." 18 U.S.C. § 2516(1)(*l*) (emphasis added). Subsection (1)(*l*) merely authorizes wire interception where the government seeks evidence needed in order to apprehend one who has obtained the status of a "fugitive from justice" by fleeing prosecution for an enumerated offense.

■    Applying the probable cause requirements of § 2518(3) to a wiretap application filed under § 2516(1)(*l*) is somewhat akin to forcing a square peg into a round hole.[3] However, subsection (1)(*l*) clearly indicates Congress' intent that information concerning the whereabouts of fugitives from enumerated crimes should be obtainable through electronic interception under § 2516. To effectuate that intent as it must, the Court finds that the following findings of probable cause are required prior to the issuance of an order authorizing interception of communications for the purpose of locating a fugitive from an enumerated crime:

---

**2.** Subsection (c), which imposes an additional requirement relating to the necessity of interception wire communications in a given investigation, is discussed separately below. *See infra,* at 1220–1221.

**3.** It appears that Congress, in adding the non-offense-specific fugitive provision to § 2516(1), neglected to adapt the applicable probable cause requirements of § 2518 either by amendment thereto or by enactment of a separate statutory section.

1) that an individual is a fugitive from justice from a particular offense enumerated in § 2516(1); and

2) that particular communications tending to reveal the location of the fugitive will be obtained through the interception sought.

■ The term "fugitive from justice" is not defined in either § 2516(1)(*l*) or the legislative history under which it was enacted in 1986 as subsection 2516(1)(k).[4] While the Court disagrees with McKinney's position that § 2516(1)(*l*) concerns a crime of "fugitive from justice," it agrees that there must be a probable cause determination that the individual referenced in (1)(*l*) has *fled*—i.e., that he is deliberately evading authorities with the specific intent to avoid prosecution.

The parties are in sharp dispute over the state of knowledge such a person must possess in order to obtain the status of a "fugitive from justice." McKinney argues that, at the very least, the affidavit in this case must have demonstrated that Billman had knowledge of the fact that he was the target of an ongoing criminal investigation. In support of her position, McKinney cites case law interpreting the Chapter 49 "Fugitive From Justice" offenses, as well as that concerning 18 U.S.C. § 3290, which tolls the federal statute of limitations where a defendant has fled from justice. Having examined the relevant statutes and the case law, the Court finds that only the offense of "Flight to avoid prosecution or giving testimony," 18 U.S.C. § 1073, provides any meaningful guidance.[5] Section 1073 provides in part that:

Whoever moves in interstate or foreign commerce with intent ... (1) to avoid prosecution, or custody or confinement

after conviction, under the laws of the place from which he flees, for a crime, or an attempt to commit a crime, punishable by death, or which is a felony under the law of the place from which the fugitive flees, ... shall be fined not more than $5,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1073.[6]

Few courts have been called upon to address the requirements of this seldom-enforced statute. However, the relevant case law makes clear that a violation of § 1073 "is complete when the offender crosses the border of the state *with the intent to avoid prosecution.*" *Lupino v. United States*, 268 F.2d 799, 801 (8th Cir.), *cert. denied*, 361 U.S. 834, 80 S.Ct. 86, 4 L.Ed.2d 75 (1959) (emphasis added); *see Reis v. United States Marshal*, 192 F.Supp. 79, 81 (E.D.Pa.1961). It is well-established that § 1073's scope is not limited to situations in which criminal charges have been formalized and are currently pending. *United States v. Frank*, 864 F.2d 992, 1007 (3d Cir.1988), *cert. denied*, 490 U.S. 1095, 109 S.Ct. 2442, 104 L.Ed.2d 998 (1989); *Lupino*, 268 F.2d at 800–02; *United States v. Bando*, 244 F.2d 833, 843 (2d Cir.), *cert. denied*, 355 U.S. 844, 78 S.Ct. 67, 2 L.Ed.2d 53 (1957); *Barker v. United States*, 178 F.2d 803, 804–05 (5th Cir.1949), *cert. denied*, 339 U.S. 968, 70 S.Ct. 985, 94 L.Ed. 1376 (1950). In *Bando*, the defendant argued that it would not be an offense under § 1073 for a person who committed the crime of mayhem to flee across state lines before a prosecution against him had been formally instituted. The court responded:

---

**4.** The legislative history relating to the amendments which added the fugitive wiretap provision in 1986 makes no mention of the fugitive provision itself. *See* S.Rep. No. 541, 99th Cong., 2d Sess. 28, *reprinted in* 1986 U.S.Code Cong. & Admin.News 3555, 3582.

**5.** The Court wishes to stress that, in light of its finding that 18 U.S.C. § 2516(1)(*l*) pertains to evidence of the *whereabouts* of fugitives for an enumerated offense, rather than evidence of a separate offense called "fugitive from justice," the case law interpreting 18 U.S.C. § 1073 is in

no way binding precedent with regard to § 2516(1)(*l*). It does, however, provide guidance by analogy in the absence of relevant legislative history.

**6.** Section 1073 also penalizes flight to avoid giving testimony in a criminal proceeding, as well as flight to avoid service of, or contempt proceedings for alleged disobedience of, process requiring attendance and the giving of testimony or the production of documentary evidence before a State agency empowered to conduct criminal investigations. 18 U.S.C. § 1073.

An analysis of Sec. 1073 does not support any such narrow and strained construction. The words "to avoid prosecution" mean "to avoid being prosecuted." The statute does not say "to avoid a *pending* prosecution." Nor is the word "charged" used in the first half of § 1073 in relation to the flight "to avoid prosecution"; but it is used, quite naturally, in the second half of Sec. 1073 in relation to flight "to avoid giving testimony." The two are separate crimes. The latter requires some pending criminal proceeding. The former does not. It is sufficient if the fleeing felon is "subject to prosecution."

244 F.2d at 843 (quoting *United States v. Miller*, 17 F.Supp. 65, 67 (W.D.Ky.1936); emphasis in original).[7]

McKinney argues that an individual may not be considered a "fugitive" under § 2516(1)(*l*) unless he knows either that he is wanted on an arrest warrant, or that he is the target of an ongoing criminal investigation. In taking this position, McKinney implicitly asserts that one cannot possibly form the intent to avoid criminal prosecution for a completed crime until he is aware that the authorities have targeted him as a focus of inquiry. If this were the case, however, one who assassinated the President of the United States in violation of 18 U.S.C. § 1751, an enumerated offense, and then fled thinking that he had made a clean escape, would not be subject to subsection (1)(*l*) until he became aware that the authorities were on his trail. Such a result would fly in the face of any logical interpretation of congressional intent in enacting subsection (1)(*l*).

■ After considering the relevant case law, as well as the clear purpose of the statute, the Court finds no requirement that a "fugitive" under § 2516(1)(*l*) must know either that criminal charges against him have been formalized in any way or that he is the target of an ongoing criminal investigation. Rather, a court issuing an interception order under § 2516(1)(*l*) must merely find probable cause to believe that an individual has fled from authorities in fear that he would otherwise be subject to present or future criminal prosecution for an enumerated crime.

Courts presented with wiretap applications must make the necessary determinations with the understanding that:

> Applications for electronic surveillance orders, like search warrants, are to be read "in a common sense and realistic fashion." ... Assessments concerning probable cause are to be made after the 'totality of the circumstances' test has been used to determine the adequacy of an application.

*United States v. Errera*, 616 F.Supp. 1145, 1149 (D.Md.1985) (citations omitted); *see Illinois v. Gates*, 462 U.S. 213, 237–38, 103

---

**7.** The Court finds cases cited by McKinney that interpret 18 U.S.C. §§ 1071 (Concealing a person from arrest) and 1072 (Concealing an escaped prisoner) wholly inapplicable to the present inquiry. These statutes require on their face that the individual harbored must be a "person for whose arrest a warrant or process has been issued," 18 U.S.C. § 1071, or an escaped prisoner. 18 U.S.C. § 1072. In contrast, it is well-established that § 1073 does not require the formalization of charges in order for one who flees potential prosecution to be considered a fugitive.

The Court finds *United States v. De Risio*, 686 F.Supp. 82 (S.D.N.Y.1988), which addresses the state of mind required for tolling of the five-year federal statute of limitations under 18 U.S.C. § 3290, to be inapplicable for similar reasons. The *De Risio* court ruled that the intent to flee which is essential to toll the statute may be inferred "from a person's failure to surrender to authorities once he learns that charges against him are pending." 686 F.Supp. at 85 (citation omitted; emphasis added). Once again, the more analogous case law under 18 U.S.C. § 1073 contains no requirement that charges be formalized and pending. This distinction between *De Risio* and the § 1073 cases is illuminated by the following premises underlying § 3290: 1) that a person may not employ a statute of limitations to his own advantage simply by intentionally avoiding capture and prosecution on a pending charge; and 2) that a person utterly without knowledge that criminal charges are pending who happens to avoid the authorities (who may or not be diligent in searching for him) should be afforded the protection of the statute of limitations. Neither these premises nor the various public policies underlying statutes of limitations have any application to the questions now before the Court regarding the authorization in § 2516(1)(*l*) for wiretaps intended to secure evidence of a fugitive's whereabouts.

S.Ct. 2317, 2331–32, 76 L.Ed.2d 527 (1983). There is no magic formula for evidence of intent to flee. The issuing judge must simply determine whether the affidavit supporting the wiretap application under § 2516(1)(*l*), when read as a whole, establishes probable cause to believe that the missing individual is purposely evading the authorities out of fear that he will otherwise be prosecuted for an enumerated crime.

▪ Moreover, the Court notes that determinations by an issuing judge are accorded substantial deference upon a subsequent suppression motion. *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986); *see Errera*, 616 F.Supp. at 1149 (holding that "[w]here electronic surveillance has been authorized by a judicial officer, 'the fact that the issuing judge found probable cause is itself a substantial factor tending to uphold the validity of the order issued'"). The function of this Court, which is essentially reviewing the previous findings of Judge Bryan, is "not to make de novo determinations of sufficiency as if it were [an issuing] judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *United States v. Scibelli*, 549 F.2d 222, 226 (1st Cir.), *cert. denied*, 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977).

#### b. Required finding of necessity

▪ In addition to the specific probable cause determinations, 18 U.S.C. § 2518(3)(c) requires the issuing court to find that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Section 2518(1)(c) requires that the application contain a "full and complete statement" as to the circumstances supporting this second finding, which will hereinafter be referred to as the "necessity" requirement. This requirement applies with no modification needed to applications for wiretap orders under § 2516(1)(*l*).

The Fourth Circuit has noted with regard to the necessity statement in a wiretap application that "[t]he mere 'boilerplate recitation of the difficulties of gathering usable evidence' cannot suffice." *United States v. Leavis*, 853 F.2d 215, 221 (4th Cir.1988) (quoting *United States v. Kerrigan*, 514 F.2d 35, 38 (9th Cir.), *cert. denied*, 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975)). However, "the showing of need made pursuant to § 2518(1)(c) is 'to be tested in a practical and commonsense fashion.'" *United States v. Clerkley*, 556 F.2d 709, 714 (4th Cir.1977), *cert. denied*, 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978) (quoting 1968 U.S.Code, Cong. & Admin.News 2112, 2190).

In *Clerkley*, the court noted that § 2518(1)(c) offers two alternatives to the government. It may show that traditional investigative techniques have been tried and have failed, or it may show that they are unlikely to succeed. *Id.* at 715. Moreover, the court clearly stated that "police need not exhaust every conceivable technique before making an application for a wiretap." *Id.* As the Supreme Court has written, the necessity requirement "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974).

With the foregoing legal framework in mind, the Court must now examine the affidavits underlying the three interception orders here at issue in order to determine whether each contained sufficient factual bases to support Judge Bryan's findings of probable cause and necessity.

#### II. The Original McKinney Application

The affidavit underlying the original application to intercept communications over McKinney's home telephone line in Alexandria, Virginia, was sworn to by David P. Cyr, Postal Inspector, United States Postal Service ("the affiant"). It noted preliminarily that the affiant was assigned to investigate violations of 18 U.S.C. §§ 1341, 1343 and 2314, which are enumerated crimes under § 2516(1)(c). It then stated that, in the affiant's opinion, probable cause existed to believe that Billman was a

fugitive under what was at the time subsection (1)(k), after having committed offenses defined in §§ 1341, 1343 and 2314. It continued that there was probable cause to believe that interception of communications over McKinney's phone would yield information concerning Billman's whereabouts, and particularized six specific types of communications which would contain such information. Finally, it stated that normal investigative procedures that had been tried had not been fully successful, that those which had not been tried appeared unlikely to succeed, and that there was probable cause to believe that McKinney, Billman and others would continue to use McKinney's phone line while Billman avoided detection. In support of these conclusions, the affidavit recited factual allegations based upon the affiant's personal knowledge of the Billman investigation.

### a. Whether Billman was a fugitive from an enumerated crime

█ The affidavit first briefly recounted the basic factual circumstances surrounding Billman's alleged role in the collapse of the Community Savings & Loan Association ("Community"). Billman owned 80 percent of a holding company which acquired 99 percent of Community's outstanding common stock and from October, 1982, through July, 1985, was chairman of Community's board of directors. The affidavit described how Billman allegedly used his control over Community to cause unlawful diversions of funds belonging to Community's depositors by numerous means, most of which related to Equity Programs Investment Corporation ("EPIC"), a real estate conglomerate which Billman created and operated. It also recited the affiant's belief that Billman used Crysopt Corporation, of which he owned 100 percent of the stock, as a conduit for movement of fraudulently diverted funds and described the role played by McKinney in the alleged scheme. Significantly, the affidavit recounted the fact that on December 21, 1988, a U.S. Magistrate Judge of this district issued a warrant for Billman's arrest based upon a finding of probable cause that Billman had violated 18 U.S.C. §§ 1341, 1343 and 2314, three offenses enumerated in § 2516(1)(c).[8]

The affidavit also averred that Billman transferred over 22 million dollars to Swiss bank accounts in the period just before, and then just after, the collapse of Community and that the funds were proceeds from the fraud on Community. It further averred that the Maryland Deposit Insurance Fund ("MDIF"), after covering most of the 100 million dollars in Community's losses, had secured civil judgments of 112 million dollars against Billman and 101 million dollars against McKinney in September, 1988. Furthermore, it stated that since the fall of 1988, Billman had failed to appear for three scheduled depositions in the *MDIF v. Billman* civil case.

After asserting that the affiant had "made every effort" to locate Billman since December, 1988, the affidavit recounted those efforts in great detail. It first recalled efforts made in early December, 1988, to find Billman at his home address, where two summons lay unclaimed on the front doorstep. At the time, two persons had told the affiant through the closed front door that the Billmans were not at home, that they did not know when Billman would return, and that "the lawyer told them not to open the door." After stating that Billman had failed to appear at a scheduled hearing before the Montgomery

---

8. The Court finds the affidavit's abbreviated recital of these extremely complex events sufficient in light of the prior determination of probable cause that Billman had violated three enumerated offenses. The question of whether there was probable cause to believe that Billman had actually committed an enumerated offense clearly need not have been revisited by Judge Bryan in issuing the wire interception orders under 18 U.S.C. § 2516(1)(*l*). Judge Bryan need only have found that Billman fled prosecution for an enumerated offense. It is thus the *existence* of the arrest warrant for enumerated offenses, as well as the warrant's underlying findings, which were relevant to Judge Bryan's inquiry. Therefore, the affiant's failure to attach the arrest warrant itself or *its* underlying application to the McKinney interception application was in no way fatal to a finding of probable cause that Billman was in fact a fugitive.

County Circuit Court on December 7, 1988, the affidavit continued with efforts made to find Billman at his estate on the Eastern Shore of Maryland.

McKinney argues that these factual allegations did not support probable cause concerning Billman's fugitive status because they concerned events before the arrest warrant was issued and, thus, could not support a finding that Billman knew of the warrant's existence at the time. However, in light of the Court's ruling that such knowledge on Billman's part was not crucial to a determination that he was a fugitive, these facts were relevant to the extent that they suggested an intention to flee on Billman's part from the fall of 1988 on.

The affidavit continued by detailing efforts to find Billman through assorted other means, including the use of various agency computer systems, review of U.S. Customs Service records, and reference to airline reservations lists. Significantly, it stated that Billman had ceased, with one exception, the use of his American Express, VISA, Texaco and Chevron credit cards since September, 1988.

The affidavit then recounted reviews of certain hotel records, including the fact that Billman had used a false home address when registering at a California hotel in late November, 1988. It also described reviews of phone records and mail covers. Based on all of this data, the affiant stated that he had pinpointed Billman's location at only four previous points in time. Two of these, in the fall of 1988, were in California. Those in January and March, 1989, were in Geneva, Switzerland, and London, England, respectively. Finally, the affidavit recalled the efforts up to that time to locate Billman overseas.

Having reviewed these and other recitals in the affidavit, the Court finds that, under the totality of the circumstances, they were more than adequate to support probable cause to believe that Billman had fled from authorities in fear that he would otherwise be subject to present or future criminal prosecution. They painted a vivid picture of an individual who was purposefully evading detection. Moreover, the Court finds that Billman need not have actually known there was a warrant for his arrest in order to believe, based upon the 112 million dollar civil judgment against him, that criminal fraud charges might well be forthcoming in the near future. Even without asserting that Billman knew he was under investigation, the affidavit, when read as a whole, was sufficient to support an inference that Billman was intentionally evading the authorities out of fear that he might otherwise have to face criminal charges arising out of the Community Savings and Loan collapse.

### b. Whether communications pertaining to Billman's whereabouts will be intercepted

■ The Court must next determine whether there was probable cause to believe that particular communications tending to reveal Billman's location would be obtained through the interception of communications over McKinney's home phone. The recitations in the affidavit which were relevant to this determination included the following facts.

Billman and McKinney were believed to have an ongoing intimate personal relationship. In addition, the affidavit later stated that "[i]t appears that Barbara A. McKinney is the only confidante of Tom J. Billman." Available phone records from hotels indicated calls by Billman to McKinney from California in December, 1988, and from Geneva, Switzerland, in late January, 1989. McKinney lived alone in a condominium complex called Porto Vecchio. Data gathered from a court-ordered pen register on McKinney's phone indicated that 13 times between March 16 and April 21, 1989, it had been used to call Billman's computerized message center number. On each occasion, the caller had used Billman's 4-digit pass code to access his messages. Eleven out of those 13 times, the caller sent codes which ultimately stored 1 message and deleted 22 messages. On this basis, the affiant concluded that McKinney was retrieving for eventual relay messages left for Billman through his computer service. Finally, the affidavit stated that surveillance

of McKinney's home had been conducted in case Billman was using it as a residence but that he had not been seen there.

On this basis, the affiant asserted that there was probable cause to believe that the following particular types of information regarding Billman's whereabouts would be intercepted over McKinney's phone line: 1) calls from Billman to McKinney to receive messages she had retrieved from his computer message service; 2) calls from Billman in which he instructed McKinney on the handling of his business affairs; 3) calls during which Billman and McKinney would discuss a possible meeting; 4) calls during which Billman and McKinney might make identifiable reference to his whereabouts; 5) calls from McKinney to Billman's friends, relatives, or business associates in which they might discuss Billman's whereabouts, as well as recent and future contacts with him; and 6) conversations between McKinney and airlines, hotels, or travel agencies indicating the location and dates of a future meeting between her and Billman. The Court finds that the factual recitals in the affidavit were sufficient to support probable cause for belief that these types of communications might be intercepted over McKinney's home phone line. Furthermore, the Court finds that these types of information regarding Billman's whereabouts are exactly what 18 U.S.C. § 2516(1)(*l*) was designed to enable the government to intercept.

McKinney appears to argue that probable cause was lacking because there was nothing in the affidavit to indicate either that she knew Billman was wanted for arrest or that she knew his whereabouts. However, the Court finds it completely irrelevant whether McKinney knew of Billman's fugitive status during this period. The only relevant circumstances were that Billman was fleeing potential prosecution and that the interception of communications over her phone would yield information regarding his whereabouts. The affidavit clearly provided the basis for a reasonable inference that Billman was using McKinney as conduit for information and that she might well have been the only

person, other than his attorney, with whom Billman was in regular contact.

### c. The necessity of wire interception

■ Finally, the Court must determine whether the affidavit's allegations supported Judge Bryan's findings that traditional investigative procedures that had been tried had failed and that those not tried reasonably appeared unlikely to succeed. The affidavit carefully explained the affiant's belief, after conducting an extensive search spanning almost five months, that a wiretap was necessary in order to locate and apprehend Billman. It detailed six alternative techniques, including use of undercover agents, physical surveillance, analysis of pen register records, "trap and trace" of incoming calls to McKinney's phone, search warrants and the grand jury, and explained either why they had been tried and had failed, or why they were unlikely to succeed if tried in the future. These were not generalized boilerplate recitals. Rather, they explained why each alternative method, as applied to this particular case, would not yield the information concerning Billman's whereabouts sought in the application.

McKinney argues that the affidavit failed to satisfy the necessity requirement because it failed to state that investigators had informed Billman, his attorney, or McKinney of the pendency of a criminal action. In making this argument, McKinney appears to assert that, having fled to avoid a potential prosecution, Billman might well have returned to face the music had he only known that charges were pending. Of course, the more reasonable inference to draw is that, had he been so informed, Billman would have ceased any and all contact with McKinney which might have made electronic interception fruitful. The Court has already noted that each and every possible investigative technique need not be exhausted prior to application for a wiretap order. *United States v. Clerkley*, 556 F.2d at 715. The Court cannot find that the government's failure to attempt, or even to mention, a method so inherently unlikely to succeed was fatal to its application in this case. The government cannot

be required to foresee every conceivable argument which defense counsel may make at a much later stage of a criminal proceeding, including assertions of the nature involved here, which literally defy common sense.

Under the circumstances, the Court finds that the affidavit sufficiently supported Judge Bryan's determination that electronic interception over McKinney's phone line was necessary in order to obtain information regarding Billman's whereabouts. Accordingly, because the affidavit underlying the original McKinney interception order sufficiently supported all of the requirements prescribed by the federal wiretap statute, McKinney's motion to suppress evidence obtained as a result of the original McKinney interception order will be denied.

### III. The "Bills" Application

On May 19, 1989, Judge Bryan granted an application for a 24–hour period of interception over a phone line subscribed to by L.N. Bills in Springfield, Virginia. The purpose of this application remained to intercept communications regarding Billman's whereabouts pursuant to what is now codified as 18 U.S.C. § 2516(1)(*l* ). Investigators sought authorization to intercept communications over the Bills phone line because Billman and McKinney had begun to speak in a very guarded manner over McKinney's home phone. On the basis of information gathered from the prior interceptions over McKinney's phone, investigators believed that she and Billman would use the Bills phone to guard the secrecy of their communications. As such, the application was filed pursuant to 18 U.S.C. § 2518(11)(b) which provides in pertinent part that:

> (11) The requirements of subsections (1)(b)(ii) and (3)(d) of this section relating to specification of facilities from which, or the place where, the communication is to be intercepted do not apply if—
>
> .    .    .    .    .    .
>
> (b) in the case of an application with respect to wire or electronic communication—
>
> .    .    .    .    .

(ii) the application identifies the person believed to be committing the offense and whose communications are to be intercepted and the applicant makes a showing of a purpose, on the part of that person, to thwart interception by changing facilities; and

(iii) the judge finds that such purpose has been adequately shown.

18 U.S.C. § 2518(11)(b). Basically, § 2518(11) relaxes the specificity requirements with regard to exact facilities to be intercepted where the target of an investigation has indicated an attempt to thwart interception by arranging to speak over an untapped line.

The affidavit underlying the Bills application attached and incorporated the original McKinney affidavit, which the Court has already found sufficient under § 2516(1)(*l* ). Therefore, the only question for the Court is whether this second application contained factual recitals sufficient to support a finding that Billman and McKinney were attempting to conceal communications which might indicate his whereabouts by using a different phone line. The Bills affidavit recounted a number of calls intercepted over McKinney's home phone and included the following significant factual recitals. During a 14–minute call on April 29, 1989, Billman and McKinney spoke of two business matters in a manner so guarded that they appeared to have trouble understanding each other. Billman stated that he hoped to be able to talk with McKinney on a "phone that makes some real sense" sometime early in the next week. During that call, Billman made a number of allusions indicating that he was outside the United States. Later the same day, McKinney called Billman's attorney and told him she had heard from Billman but that they had only spoken briefly because he had called her at home.

During a subsequent call on May 3, 1989, Billman made a guarded reference to calling the next day at 11:00 or 11:15 a.m. at the home of "Mabel and Tommy." The affiant believed "Mabel and Tommy" to be friends of McKinney whose phone number was (703) 455–1440 because McKinney had

previously called that number, greeted the male who answered "Tommy," and then asked for "Mabel." Chesapeake and Potomac Telephone Company subsequently identified that number as being subscribed to by L.N. Bills at 7788 Richfield Court in Springfield, Virginia. An initial application made for interception of the Bills line on May 4 was withdrawn when Billman's attorney called McKinney to tell her that Billman would not be calling that day.

The affidavit then recounted a May 18, 1989 conversation between McKinney and Billman in which Billman stated "normal tomorrow." When McKinney said that she thought she understood, Billman said "Yeah, 703" which the affiant believed to mean that they would speak the next day at their pre-arranged number in the 703 area code. On this basis, the affiant believed that McKinney and Billman would speak over the Bills line or some other line in the 703 area the next day. On the morning of the application, the affiant wrote by hand in the affidavit that McKinney had gone to 7788 Richfield Court in Springfield and let herself in with a key at 10:15 a.m.

The Court finds that these and other factual recitals contained in the Bills affidavit sufficiently showed an intent by Billman and McKinney to avoid interception by changing phones and using the Bills line. The affidavit clearly indicated that Billman and McKinney were being cautious about what they said over McKinney's phone and that they were setting up alternative methods of communication. The Court further finds that the Bills affidavit satisfied the necessity requirement by its incorporation of the original McKinney application, which clearly stated why wire interception was necessary to gain information concerning Billman's whereabouts.

McKinney's first argument relating to the Bills application essentially restates her position with regard to Billman's status as a "fugitive" under § 2516(1)(*l*). The Court has already disposed of this issue and need not address it further. She next argues that, while the affidavit indicated that Billman and McKinney were being secretive over her phone regarding a "commercial transaction," it did not support probable cause to believe that they were purposely hiding information regarding Billman's location. This argument is entirely unpersuasive for two reasons. First, communications regarding a commercial transaction might well have included information giving some indication of Billman's location either at that time or in the near future. In fact, information regarding business affairs was included in the types of communication, specified in both the original application and the Bills application, which properly could be intercepted in an attempt to find Billman. Second, the Bills affidavit clearly indicated that Billman and McKinney were being generally uncommunicative over McKinney's phone and that they were seeking a method in which they could converse freely. There was certainly probable cause to believe that, when they believed they had found such a method, one or the other might say something which would aid the search for Billman. Finally, McKinney's "necessity" argument with regard to the Bills affidavit simply restates her position, already rejected by the Court, that the investigators were required to convey the fact that Billman was wanted on criminal charges.

Because the Bills affidavit satisfied all applicable provisions of 18 U.S.C. §§ 2516(1)(*l*) and 2518, the Court finds that McKinney's motion to suppress its fruits must be denied.

**IV. The McKinney Renewal Application**

■ On June 1, 1989, an interception order was issued renewing authorization to intercept communications over McKinney's home phone in Alexandria, Virginia. The affidavit underlying this application incorporated and attached the original affidavit discussed above. In addition, it included factual recitals taken from the Bills affidavit, as well as additional information gained as a result of the earlier interceptions. Moreover, the affidavit, which once again sought interception under 18 U.S.C. § 2516(1)(*l*), also sought authorization to gather evidence of "Laundering of monetary instruments," an offense defined by

18 U.S.C. § 1956 which is enumerated in § 2516(1)(c).

Preliminarily, the Court notes the government's proffer that it does not intend to introduce at trial any conversations intercepted during the renewal period. However, having reviewed the renewal affidavit, the Court finds in any event that it clearly satisfied the probable cause and necessity requirements discussed earlier. In fact, its factual basis indicating Billman's intent to avoid prosecution was even stronger than that in the original affidavit. The renewal affidavit recounted a conversation in which Billman compared the relative safety of using different phone lines, stating "the whole thing just scares ... me. In fact, I mean frankly at some point I'm planning just to discontinue phone use." Billman continued that a birthday card he had sent to McKinney was "being hand-carried to a far place before it gets dropped in a mail box ... [b]ecause I'm sure they're watching you." In a later conversation, Billman stated that he had a "certain perspective that's created in my new circumstances.... Basically, I'm excited about sunshine and sunlight and staying in it." He also made a number of passing references indicating that he was somewhere in Europe. (Renewal Aff. at 13–14). These and other intercepted conversations contained in the renewal affidavit made quite clear that Billman had fled potential criminal prosecution in the United States. As the Court stated earlier, there was no requirement that Judge Bryan revisit the probable cause determinations with regard to the enumerated offenses in light of the fact that a warrant for Billman's arrest on those offenses had long since been issued.

Moreover, while the allegations supporting probable cause regarding the money laundering offense were far less prominent in the affidavit, the Court finds that they were "minimally adequate to support the determination that was made." *United States v. Scibelli*, 549 F.2d at 226. The renewal affidavit incorporated earlier allegations that Billman had transferred over 22 million dollars in fraud proceeds to Swiss bank accounts. It also added factual recitals indicating that Billman was wiring money to McKinney from overseas. Under the circumstances, the Court finds that probable cause existed in this regard as well. Finally, the necessity of continued wire interceptions was clear from the incorporated statement from the original application, as well as the simple fact that the search for Billman had failed despite the wide-reaching ongoing investigation. In addition, the affidavit stated that interception was necessary in order to obtain information regarding foreign bank accounts from which funds, which the affiant believed had been fraudulently obtained, were being transferred. Under the circumstances, the Court finds that McKinney's motion to suppress the fruits of the June 1, 1989, renewal order must be denied.

### V. Minimization

Finally, the Court notes that McKinney included in her original motion papers a brief argument that intercepted conversations had not been minimized as required by 18 U.S.C. § 2518(5). However, defense counsel indicated to the Court and to the government that they would not be pursuing this argument, and the government thereafter chose not to respond on the minimization question. In light of the fact that neither party mentioned minimization at oral argument, the issue would appear to have been waived, thus requiring no consideration by the Court.

### CONCLUSION

For all of the foregoing reasons, the Court will deny defendant Barbara A. McKinney's Motion to Suppress Electronic Surveillance Evidence. A formal order has been entered in conformity with this Opinion.